**UNITED STATES COURT**
**Southern District of Florida**
Miami Division

12-cr-60088-WPD

FILED BY _PG_ D.C.

FEB 18 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA
Respondent

vs.

JUAN CARLOS SANCHEZ
Petitioner

## MOTION FOR U VISA CERTIFICATION

COMES NOW, JUAN CARLOS SANCHEZ ("Petitioner") "pro se" and without the benefit of counsel with his motion for U visa certification, requesting the Court to exercise its discretion to provide judicial certification towards Petitioner's U visa application pursuant to 8 U.S.C. § 1101(a)(15)(U). Petitioner asserts that the Government agreed to provide the Petitioner with the judicial certification that would allow him to apply to the United States Customs and Immigration Services ("USCIS") for U visa relief that, if granted by the USCIS, would permit the Petitioner to remain in the United States and avoid any physical harm consequence of his cooperation with the United States Government's investigation and prosecution of a qualifying crime.

SUPPORTING FACTS:

On January 2nd 2013, the Petitioner was sentenced to 180 months in the United States Court, Southern District of Florida, Broward division after pleading guilty to the charges of "Conspiracy to

-1-

commit mail and wire fraud" a violation of U.S.C. 18:1349,1343 & 1341 (Case No. 12-60088-cr-Zloch).

On April 2013, the Petitioner was approached through his attorney Mr. Paul D. Petruzzi by several Government law enforcement agencies in regards to information unrelated to the Petitioner's case that could be of substantial assistance in the investigation of a crime in which the Petitioner was also a victim.

During that year, Special DEA agent Brian Whitworth, Special DEA agent Cesar Salaya, and AUSA Richard Gregorie held multiple meetings with the Petitioner in which the Petitioner provided the Government with thousands of emails, phone records and hours of recorded testimony that established the involvemnt of several high ranking officials of the Venezuelan Government in crimes related to extortion, drug trafficking and money laundering. Part of this evidence included threatening emails that were sent to the petitioner from the Venezuelan officials being investigated, this emails included a video of a prisoner in a Venezuelan prison being sodomized and another one of a murder for hire being carried out. Both emails had a threatening message addressed to the Petitioner and his family, and they were later used in the testimony of AUSA Richard Gregorie to the Grand Jury as well as Magistrate Chris Mc.Alley at the bond hearing for Mr. Palmeri. (See appendix A, newpapers articles and appendix B Indictment of USA v Benny Palmeri page 5).

After several meetings with the United States Government officials, it was determined that due to the Petitioner's cooperation his life was at risk and both AUSA Richard Gregorie and

Special DEA agent Brian Whitworth agreed to provide the Petitioner with a Law Enforcement Certification (LEC) once the investigation had concluded in order for the Petitioner to obtain an U-visa. In one of these meetings they mentioned that "deporting Mr. Sanchez to Venezuela would be considered a death sentence for him..."

On October 2013, the Petitioner testified in front of a Federal Grand Jury, testimony that lead to the indictment of Mr. Rodolfo McTurk and Mr. Benny Palmeri (case No. 13-20930-CR-UNGARO), Hugo "El Pollo" Carvajal and other high ranking officials that are currently under investigation or under sealed indictments.

In Mr. Palmeri's indictment (case No. 13-20930-cr-Ungaro) the petitioner was identified as J.C.S. (Juan Carlos Sanchez) owner of a Real Estate School and company. Later, newspaper articles identified the Petitioner by name and city of residence (See Appendix A). These newspaper articles circulated all over the United States, Venezuela and different Government online forums.

On July 24th, 2014, Mr. Hugo Carvajal was arrested in Aruba, and Mr. Palmeri was arrested in the City of Miami, Florida. This was possible due to a strategy that was developed with the information provided by the Petitioner (See resentencing transcripts Document 551 case 12-cr60088 page 19, lines 6 to 12) that lured Mr. Palmeri to travel outside of Venezuela where he enjoyed the protection of no-extradition. The information that the Petitioner provided the Government about Mr. Palmeri was not public knowledge and clearly identified the source, risking his safety upon returning to Venezuela.

On June 2018, the Petitioner received a sentence reduction

pursuant to Rule35(b) due to his substantial assistance in the prosecution of several High ranking officials of the Venezuelan Government (See Appendix B). During that hearing it was mentioned by AUSA Richard Gregorie that Mr. Rodolfo McTurk, Director of Interpol in Venezuela, and a co-defendant of Mr. Palmeri's indictment was still on the run in Venezuela. It was also aknowledge that the Petitioner's cooperation also included information regarding the director of National Security in Venezuela as well as the Vice-president among other officials that currently reside in Venezuela and are aware of the Petitioner's cooperation and release date.

At the completion of the resentencing hearing, AUSA Richard Gregorie (ret.) approach the Petitioner's attorney Mr. Paul D. Petruzzi and the Petitioner's family and agreed to assist with providing the Law Enforcement Certification (LEC) required in order for the Petitioner to apply for an U-visa.

Upon Mr. Petruzzi contacting the office of AUSA Richard Gregorie, he was informed that due to the fact that Mr. Gregorie was retired, AUSA Adam Fels would be the person in charge of all the Venezuelan related cases, including providing the LEC for the Petitioner. Once AUSA Adam Fels was contacted, he informed attorney Petruzzi that special DEA agent Brian Whitworth would be the person providing the LEC. Several emails went back and forth between the office of Mr. Petruzzi and special DEA agent Whitworth, only to be informed months later that Mr. Adam Fels would be the person providing the Petitioner with the LEC. At that time, the Petitioner's family started reaching out to AUSA Adam Fels. In one

telephone coversation with a friend of the Petitioner's family, AUSA Fels informed her that he "was working on it and would take care of it".

On October 2018, seven months before the Petitioner's release to I.C.E. to start deportation proceedings back to Venezuela, AUSA Adam Fels informed attorney Paul Petruzzi that he would not able to provide the Petitioner with the LEC due to the fact that the Petitioner had a financial restitution impossed as part of his federal conviction.

At that point it became clear to the Petitioner that the United States Government was not acting in good faith by not providing the Petitioner with the protection offered by by the U nonimigrant classification.

As this court will see by the evidence attached, financial restitution is not a condition for the Government to provide a LEC or for the Petitioner to apply for an U-visa. During the resentencing hearing of the Petitioner (See Appendix B) it was stated several times, under oath, that due to his cooperation the Petitioner's life was at risk. It was also clearly detailed the level of the Petitioner's cooperation, as well as the fact that several individuals that have been investigated and/or indicted by the Petitioner are still on the run in Venezuela, cannot be extradited and surely await for the Petitioner's return to Venezuela.

The Petitioner is scheduled to be released on June 2nd, 2020 to the custody of ICE, and at that time deportation proceedings will begin. The petitioner has been identified in the indictment of Mr.

Benny Palmeri and Rodolfo Mc.Turk and in several newspaper articles as the source of the information for the indictment of several Government officials. Threats have already been made and confirmed by AUSA Richard Gregorie and Special DEA agent Brian Whitworth.

On January 12th 2020, while in custody at D. Ray James Correctional Facility in Folkston Georgia, a Venezuelan inmate with connections to the drug trafficking cartels in Venezuela investigated the Petitioner through Lexis-Nexis at the prison's law library and found his co-defendants appeal with the Court of Appeals of the 11th district (see case No. 17-13068). In there the Petitioner is identified by name and it details his role in the investigation of the Venezuelan drug cartels. Several threats were made against the Petitioner and he was forced by the staff to go into protective custody ("PC") for his safety. Later it was confirmed by the Special Investigators at the prison (S.I.S.) that the threats were real and that infact, the Petitioner's safety was at risk. He has been in protective custody since.

SUPPORTING LAW

In October 2000, Congress created the U nonimmigrant classification, codified in 8 U.S.C. §1101(a)(15)(U), to "strenghten then ability of law enforcement agencies to detect, investigate and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes...while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States."

-6-

Under 8 U.S.C. § 1101(a)(15)(U), a non-citizen is elegible for a U-visa if the applicant can demonstrate that: (I) The alien has suffered substantial physical or mental abluse as a result of having been a victim of criminal activity described in clause (iii); (II) The alien possesses information concerning criminal activity described in clause (iii); (III) The alien has been helpful, is being helpful, or is likely to be helpful to a Federal, State or local enforcement official, to a Federal, State or local prosecutor, to a Federal or State Judge, to the Service, or to the Federal or State authorities investigating or prosecuting criminal activity described in clause (iii) C.F.R. §214.14(b); (IV) in addition, the alien must also demonstrate that the qualifying criminal activity described in clause (iii) violated the laws of the United States or ocurred in the United States 8 U.S.C. §1101(a)(15)(U)(i)(I)-(IV).

Clause (iii) provides

The criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual assault; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restrain; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; fraud in foreign laborcontracting; or attempt, conspiracy or solicitation to commit any of the above mentioned

crimes 8 U.S.C. § 1101(a)(15)(U)(iii).

Under 8 U.S.C. §1184(p)(1), the petition filed by the non-citizen under § 1101(a)(15)(U)(i) must "contain a certification from a Federal, State, or local law enforcement official, prosecutor, **jusge** or other Federal, State or local authority investigating criminal activity described in section 1101(a)(15)(U)(iii)." The certification must "state that the alien 'has been helpful, is being helpful, or is likely to be helpful' in the investigation or prosecution of criminal activity described in section 1101(a)(15)(U)(iii)."

**Federal Judges** are qualified to "certify" U-visa applications. "Certifying official means (a) **Federal,** State or local **Judge.**" 8 C.F.R. §214.14(a)(3)(ii). See also Garcia v. Andubon Cmtys. Mgmt., LLC, No. 08-1291. 2008 U.S. Dist LEXIS 31221, 2008, WL 1774584, at *2 (E.D. La.April 15, 2008) (examining the complaint and exhibits attached to the U Visa certification the court recognized its authority to grant a motion for U visa certification in an FLSA action where at that point in the proceedings plaintiffs had made **prima facie** showing of qualifying criminal activity) (citing 8 U.S.C. § 1101 (a)(15)(U)(i)(III); 8 C.F.R. § 214.14(a)(3)(ii)); 72 Fed. Reg. 53014, 53020 (Recognizing that "Judges neither investigate crimes nor prosecute perpretrors," the USCIS states "that the term 'investigation' or 'prosecution' should be interpreted broadly.").

Petitioner contends that he was a victim of illegal acts that constitute "qualifying criminal activity" under 8 U.S.C. § 1101 (a)(15)(U)(iii) (see Case No. 13-20930-cr-Ungaro). Specifically,

Petitioner asserts that he was a victim of the following potential crime or similar activity: "Interfere with commerce by **extortion**, Title 18, U.S.C. Sect. 1951(a).

Finally, Petitioner cooperated with various Federal law enforcement agencies regarding the criminal activities and supplied them with material evidence and Grand Jury testimony in order to indict, prosecute and later convict several high ranking officials of the Venezuelan government involved in these crimes. Thus, Petitioner has established that he "has been helpful, is being helpful, or is likely to be helpful" under 8 U.S.C. §1101(a)(15)(U)(i)(III). See Garcia, 2008 U.S. Dist. LEXIS 31221, 2008 WL 1774584, at *3 ("The Court notes that on-going criminal investigation may not be necessary to certify a U-visa application because the regulations contemplate the future helpfulness of the applicant") (citing 72 Fed.Reg.53019); 2 8 C.F.R. §214.14(a)(12) ("U nonimmigrant status certification means Form **I-918 Supplement B** (See appendix C), "U Nonimmigrant status certification", which confirms that the Petitioner has been helpful, is being helpful or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim.").

Currently the Petitioner is incarcerated at D. Ray James Correctional Facility in Folkston, GA, a private facility designated for inmates that currently face deportation. By this court granting the Petitioner's request and providing him with the LEC that was originally offered by the GOvernment, ICE may grant him with a "stay of removal" since the filing of such form with the USCIS is considered "prima facie" evidence of the U-visa.

The Petitioner is scheduled to be released to the custody of ICE on June 2nd, 2020. Approval of the petitioner's **motion for U visa certification** this court will enable him not to serve any addition unnecessary time under the custody of ICE.

The Petitioner humbly comes to this court asking that his motion for U-VISA certification be granted and thanks the court for its consideration.

Respectfully submitted on this 12th day of February 2020 by

Juan Carlos Sanchez

Reg. No. 66858-054
D. Ray James Correctional Facility
PO BOX 2000
Folkston, GA 31537

CERTIFICATE OF SERVICE

I, Juan Carlos Sanchez, the Petitioner certify that this motion was hand delivered to the staff of D. Ray James Correctional Facility mail room on February 12th, 2020.

Juan Carlos Sanchez
Reg. No. 66858-054

## APPENDIX A

**CONTENT:**

* Newspaper Article - eldolartoday.com        July 24th, 2014
* Newspaper Article - El Nuevo Herald         July 25th, 2014
* Newspaper Article - Dan Molinski            July 25th, 2014
* Newspaper Article - www.tururu.com          July 26th, 2019
* Newspaper Article - www.talkleft.com        July 26th, 2014
* News Report Transcript - www.local10.com  July 29th, 2014
* Newspaper Article - Miami Herald            November 6th, 2014
* Newspaper Article - Miami Herald            March 4th, 2015
* Newspaper Article - Miami Herald            May 19th, 2015
* Newspaper Article - Antilavado de Dinero - April 18th, 2019
* Newspaper Article - Noticias Venezuela    April 28th, 2019

VEN   $ BsS. 3715,41   € BsS. 4229,73   ◉ $57,83   $1285,00(oz)   $41,31(g)

- ← INICIO
- CONTACTO
- PUBLICIDAD
- MÁS...



Noticias y Dólar paralelo

- 
- 
- TV EN VIVO
- 
- 
- 

# Ex juez venezolano arrestado en el Aeropuerto Internacional de Miami.

*ciceron / Jul 24, 2014 @ 11:11 pm*

Un ex juez venezolano y su familia volaron al Aeropuerto Internacional de Miami con planes de pasar unas vacaciones prepagadas de dos semanas en Disney World.

Benny Palmeri-Bacchi nunca llegó al parque temático de Orlando.

El fue uno de tres venezolanos encausados en casos federales de narcotráfico que por primera vez vincularon a altos funcionarios de la administración del difunto presidente Hugo Chávez con capos de los carteles venezolanos, afirmó la fiscalía el jueves. Los ex funcionarios están acusados de aceptar sobornos a cambio de permitir a los traficantes pasar cargamentos de cocaína por avión de Venezuela a México y el Caribe para su distribución en Estados Unidos.

El jueves, Palmeri-Bacchi, de 46 años, se declaró inocente en el tribunal federal de Miami de haber dado protección a un narcotraficante colombiano convicto que movía cargamentos de cocaína de Venezuela a Estados Unidos.

El ex juez, acusado de impedir la extradición del traficante, está en el centro de una investigación criminal, mantenida en secreto durante mucho tiempo, centrada a un ex director venezolano de Interpol, Rodolfo

McTurk, así como un ex jefe de inteligencia militar, Hugo Carvajal Barrios, quien fue arrestado en Aruba a principios de la semana.

Todavía no se sabe si Carvajal, cuyo arresto fue condenado por el gobierno venezolano, acabará ante el juzgado federal de Miami como Palmeri-Bacchi. El es el cónsul general pendiente de Venezuela en la isla caribeña.

En un encausamiento abierto el jueves, Carvajal está siendo acusado de ayudar a capos colombianos como el difunto Wilber Varela por medio de permitirles exportar sus cargamentos de cocaína desde Venezuela, protegerlos contra su captura, y brindarles información sobre las investigaciones de las fuerzas armadas y la policía venezolanas. A cambio, Varela pagaba sobornos al ex director de inteligencia militar y otros oficiales de alto rango de las fuerzas armadas y la policía.

Carvajal y otros funcionarios venezolanos no nombrados están acusados de invertir en los envíos de los carteles a Estados Unidos, de acuerdo con el encausamiento. En particular, el mismo alega que Carvajal vendió 100 kilos de cocaína a un miembro de la facción de Varela en el llamado Cartel del Norte del Valle en Colombia.

Varela, quien había trasladado su operación de cocaína de Colombia a Venezuela en el 2004 para evadir su captura, fue muerto en el 2008 — pero la red de sobornos entre algunos de los principales oficiales militares de Chávez y los carteles continuó durante el 2010, de acuerdo con el encausamiento, que se presentó sellado en mayo del 2013.

Carvajal está en la lista negra del Departamento del tesoro de EEUU, bajo "regulaciones de capos extranjeros de narcóticos". El es uno de un puñado de oficiales de las fuerzas armadas venezolanas en la lista.

El miércoles por la noche, las autoridades de Aruba detuvieron a Carvajal, de 54 años, bajo alegaciones de narcotráfico y de ayuda a las guerrillas colombianas. Carvajal fue detenido a petición de las autoridades estadounidenses que han solicitado su extradición, según se enteraron el Miami Herald y el Nuevo Herald.

La fiscalía espera que Carvajal se opondrá a ser extraditado y traído a Miami a enfrentar cargos de conspiración de drogas.

Carvajal fue un confidente cercano del difunto presidente Chávez, quien murió en el 2013, y dirigió el aparato de inteligencia del país del 2004 al 2009. A principios del presente año, el presidente Nicolás Maduro lo designó como cónsul general en Aruba, pero se reporta que el gobierno de los Países Bajos todavía no ha aceptado su posición.

El jueves, el gobierno de Venezuela calificó la detención de Carvajal de "ilegal y arbitraria", y dijo que el funcionario estaba protegido por su estatus diplomático.

En un comunicado, el Ministerio de Relaciones Exteriores de Venezuela dijo que había "activado todos los mecanismos diplomáticos para que se corrija esta grave violación del Derecho Internacional", y pidió a los Países Bajos que lo liberen de inmediato.

El Ministerio de Relaciones Exteriores expresó "su deseo de evitar que esta acción pueda devenir en el deterioro de las relaciones diplomáticas, económicas, energéticas y comerciales sostenidas actualmente".

El abogado defensor de Palmeri-Bacchi se negó a comentar acerca del caso de su cliente. El abogado Edward Abramson dijo sólo que a Palmeri-Bacchi "le habían tendido una trampa" cuando fue arrestado el viernes pasado en el Aeropuerto Internacional de Miami.

La esposa y el hermano del ex juez y otras personas se presentaron el jueves para su lectura de cargos, pero también se negaron a hacer declaraciones a la salida del juzgado. Su esposa lloraba abiertamente, y los demás la consolaban.

Se presentaron cargos contra Palmeri-Bacchi en encausamiento sellado en diciembre del 2013 de conspirar con el ex director de Interpol, McTurk, quien todavía se encuentra en Venezuela, para ayudar a trasladar miles de kilos de cocaína a través de ese país con destino a Estados Unidos para un narco colombiano ahora convicto, Jaime Alberto Marín-Zamora.

Marín-Zamora, uno de los lugartenientes de la facción del Norte del Valle de Varela, fue encausado en el 2009 por un gran jurado federal de Miami. El fue extraditado el año siguiente, se declaró culpable de un cargo de conspiración para tráfico de drogas en el 2011 y fue condenado a 16 años de cárcel.

Palmeri-Bacchi, quien trabajó como juez, fiscal y abogado en Venezuela, fue acusado también de lavado de dinero y conspiración para la obstrucción de la justicia, además de extorsión. Se alega que amenazó a un hombre identificado como J.C.S. y a su familia "con fuerza, violencia y terror" para sacarle dinero y propiedades. J.C.S. fue descrito en el encausamiento como propietario de una compañía de bienes raíces y una escuela para corredores inmobiliarios.

El fiscal federal adjunto Richard Gregorie planeaba hacer una presentación en la audiencia de fianza del venezolano el jueves que hubiera mostrado que Palmeri-Bacchi había enviado correos electrónicos amenazadores a J.C.S. con archivos adjuntos. Los archivos adjuntos incluían un video de alguien siendo asesinado en la vida real, así como fotos de prisioneros siendo sodomizados en una cárcel venezolana.

El juez magistrado Chris McAliley pospuso la audiencia de fianza luego que el abogado defensor estuvo de acuerdo temporalmente con la solicitud de la fiscalía de detención previa al juicio, basada en el peligro de fuga y peligro para la comunidad. No se ha fijado fecha para la audiencia de fianza.

La fiscalía está tratando además de confiscar $2.5 millones de cuentas de Palmeri-Bacchi y McTurk, el ex director de Interpol, en tres bancos de Miami: Wells Fargo, Espírito Santo y Banco Santander International.

Source: DolarToday News

**Former Venezuelan judge in arrested at Miami International Airport**
July 24th, 2014@11:11 pm

**Taken from El Venezolano Newspaper** - A former Venezuelan ex-judge and his family flew into Miami international airport with a two week all expenses paid trip planned for Walt Disney World.

But **Benny Palmeri Bacchi** never made it to the theme parks in Orlando.

He is one of the three Venezuelans accused in Federal cases of drug trafficking that, for the first time link high ranking officials from the government of the now desceased president **Hugo Chavez** to the Colombian cartels- the prosecutors said this Thursday.

The former officials are accused of accepting bribes in order to allow the drug lords to send shipments of cocaine from Venezuela to Mexico and the Caribbean in order to later distribute in the United States.

The judge is accused of blocking the extradition order of a drug trafficker, which made him the center of a long undercover investigation directed towards the former Venezuelan director of Interpol, Rodolfo McTurk, as well as the former director of Military intelligence, Hugo Carvajal Barrios, who was arrested in Aruba.

If Carvajal, whose detention was questioned by the Venezuelan government, ends up in Miami like Palmeri Bacchi is still to be seen, although some say that he will go to New York and others to Washington DC.

In a complaint filed today Thursday, Carvajal is accused of helping Colombian drug traffickers members of the network of the now desceased Wilber Varela a.k.a. "Jabon" who was murdered in a hotel in the State of Merida in Venezuela by an armed group.

Meanwhile, General Carvajal and his accomplices were members of the organization allowing them to export his shipments of cocaine from Venezuela, protecting them from being captured, and providing them with information about military and police investigations, in exchange, Varela paid bribes to the former director of military intelligence and other military officials and high ranking police officials.

Carvajal, and other non-identified Venezuelan officials are accused of investing in the shipments that the cartels sent to the United States, said the indictment, in particular, it says that Carvajal sold 100 kilos of cocaine to a member of the Varela group in the known "Cartel del Norte del Valle" in Colombia.

Varela, who had moved his operation from Colombia to Venezuela in 2004 to avoid his capture, was murdered in 2008 - but the bribes between high ranking officials from Chavez and the cartels continued until the year 2010, according to the indictment filed in secret in May 2013.

Carvajal is in the black list of the **Department of the Treasure in the United States under the "sanction rules of Drug Trafficking foreign leaders".** He is one of the handfull of Venezuelan military officials that are on the list.

Wednesday night, the Aruba authorities arrested 54 year old Carvajal, for accusations of drug trafficking and aiding the Colombian guerrilla. This was done after the United States asked for his extradition.

The prosecutors expect that Carvajal will fight his extradition to face charges of drug trafficking in Miami.

Carvajal was a close confident, colaborator and high trusted man of the now desceased president Chavez, who died in 2013, and he was also the chief of the inteligence aparatus of the country from 2004 to 2009.

At the begining of this year, Nicolas Maduro, in a quick use of the pen named him General Chanciller in Aruba, but, according to reports from the governments of the Lower Countries they still had not confirmed his appointment due to the dark background of Carvajal since his drug trafficking activities with the FARC and the Colombian cartels were not a secret.

Maduro's government has expressed its protest against Holland for the arrest of his trusted allied General Hugo Carvajal, and he labeled it as "illegal and arbitrary", and said that the official was protected by his diplomatic status - although Carvajal attempted to enter Aruba with a fake passport and another identity, but when he realized that he was being arrested he provided the diplomatic document. Both documents are in possession of the island authorities.

In a press release, the Foreign Relations Department in Venezuela said that it was "activating all diplomatic mechanisms to correct this grave violation of the international laws" and asked the lower countries for his immediate release.

"We expect that this action doesn't lead to the damage of our economic, energy and commercial relationships" said the Foreing Relations Department.

Meanwhile, on Thursday the attorney for the former Venezuelan judge Palmeri-Bacchi had no comments about the case of his client.

Attorney Edward Abramson just said that "Palmeri Bacchi walked into a bear trap" when he was arrested in the Miami Iternational Airport last Friday.

His wife, brother and other family members of the former judge met for his hearing today Thursday at the Federal courthouse in Miami, however he declined to comment outside of the court.

Palmeri Bachi was charged in a secret indictment in December 2013 under the charges of conspiring with the former director of Interpol, McTurk, who is still in Venezuela,

to help move thousands of kilos of cocaine through that country to the United States for a now incarcerated Colombian drug trafficker, Jaime Alberto Marin Zamora.

Marin-Zamora, leutenant of the North Valley group of Varela, was indicted in 2009 by a Federal grand jury in Miami. Was extradited the following year, pled guilty of one count of conspiracy to traffick drugs in 2011 and was sentenced to 16 years in prison.

Palmeri-Bacchi, who worked as a judge, prosecutor and attorney in Venzuela, was also accused of money laundry, and obstruction of justice, as well as extortion. Supposedly, he threatened a man identified as J.C.S. and his family with "force, fear and violence" to obtain money and property. J.C.S. was described in the indictment as the owner of a Real Estate company and a Real Estate school.

Assistant United States Prosecutor Richard Gregorie planned to have a presentation for the bond hearing of the Venezuelan, in there he would had shown that Palmeri-Bacchi supposedly sent threatening emails to J.C.S. with attached files.

Those attachments included a video of somebody being murdered, as well as images of inmates sadomizing another one in a prison in Venezuela, according to the conversations heard outside of the courtroom.

Magistrate Judge Chris McAlley postponed the bond hearing after the attorney for the defendant agreed with the prosecution in regards to the flight risk and danger to the community. There is no date for the next bond hearing.

The prosecution is also trying to obtain 2.5 million dollars in accounts opened by Palmeri-Bacchi and McTurk, the former director of interpol in the three Miami banks, Wells Fargo, Espiritu Santo and Banco Santander International.

salsaver... Clases de salsa para adultos y niños, clases particulares disponibles



Omar Moynelo regresa
con un nuevo "arañazo"
**VIERNES/22D**

Examen preocupa
a la Junta Escolar
**LOCALES/1B**



LEON
MED

305-642-

# el Nuevo Heral

Una publicación de The Miami Herald Media Co.

**PREMIO ORTEGA Y GASSET**          elNuevoHerald.com          VIERNES 2



**VENEZUELA · A**

# Atrapan
## militar c
## en tráfic
## narcótic

▨ Detenido Hugo Carv
de inteligencia militar d



el malfuncionamiento de
...tractores de gases y un sali-
...en un tubería de drenaje, han
...dido su apertura.
...que es un cliché, pero si se
...lo mismo de su cocina o de un
... bajo la bahía de Biscayne,
...l no dejaría que el contratista
...rche hasta que todo esté per-
...", dijo Hodgkins, citando una
...que se ha convertido en un
...ra para casi todo el mundo
...ionado con el proyecto del tú-
...n los últimos dos meses.
...contratista, Bouygues con se-
...l París, ha estado pagando
...multa de $115,000 diarios al
...Concessionaire mientras el
...l ha estado cerrado. Al mismo

tiempo, el Departamento de
Transporte de la Florida ha retra-
sado el inicio del pago de $33 millo-
nes anuales al concesionario has-
ta tanto no se abra el túnel.

Pero una vorágine de actividad
en los últimos días indica que el
túnel está a punto de concluir. El
miércoles, los trabajadores termi-
naron la cirugía mayor necesaria
para reparar la fuga de drenaje:
una zanja de 2,000 pies, cortando
15 pulgadas de cemento, cuatro
pulgadas de asfalto y 15 pies de
hormigón armado, donde se colo-
có una nueva tubería de
polietileno.

VEA **TUNEL** EN LA PÁGINA 2A

gencia Militar y uno
de los hombres más temi-
dos de Venezuela, fue
arrestado la tarde del miér-
coles en el aeropuerto in-
ternacional Queen Beatriz
de Aruba por su presunta
participación en operacio-

...interdicción del Departa-
mento del Tesoro por su
presunta participación en
las operaciones de narco-

VEA **CARVAJAL** EN LA PÁGINA 2A

■ Caracas reacciona a la
detención de Carvajal 5A



**RODOLFO
MCTURK,**
al centro, y
su equipo
de trabajo
en una foto
sin fecha.

Diario Correo del Orinoco

# Encausan en EEUU
# a chavistas por dar
# protección a narcos

**JAY WEAVER**
jweaver@MiamiHerald.com

Un ex juez venezolano
y su familia volaron
al Aeropuerto Inter-
nacional de Miami
con planes de pasar unas
vacaciones prepagadas de
dos semanas en Disney
World.

Benny Palmeri-Bacchi
nunca llegó al parque te-
mático de Orlando.

El fue uno de tres ve-
zolanos encausados en ca-
sos federales de narcotráfi-
co que por primera vez vin-
cularon a altos funciona-
rios de la administración
del difunto presidente Hu-
go Chávez con capos de los
carteles venezolanos, afir-
mó la fiscalía el jueves. Los
ex funcionarios están acu-
sados de aceptar sobornos
a cambio de permitir a los

traficantes pasar carga-
mentos de cocaína por
avión de Venezuela a Méxi-
co y el Caribe para su dis-
tribución en Estados
Unidos.

El jueves, Palmeri-Bac-
chi, de 46 años, se declaró
inocente en el tribunal fe-
deral de Miami de haber
dado protección a un nar-
cotraficante colombiano
convicto que movía carga-
mentos de cocaína de Vene-
zuela a Estados Unidos.

El ex juez, acusado de
impedir la extradición del
traficante, está en el centro
de una investigación cri-
minal, mantenida en secre-
to durante mucho tiempo,
centrada a un ex director
venezolano de Interpol, Ro-
dolfo McTurk, así como un
ex jefe de inteligencia mili-

VEA **DROGAS** EN LA PÁGINA 2A



**Ubican restos
de avión
caído en Mali**

Los restos del avión de pasajeros de Air Algerie que se
estrelló el jueves fueron hallados a unos 50 kilómetros
(31 millas) de la frontera de Burkina Faso, cerca del po-
blado de Bulikesi, en Mali, dijo un alto funcionario de
Burkina Faso. 4A

uatro fosas
...nas asesi-
...erra Civil es-
...urgos. 4A



preguntas sobre Medicare?
de ayudar

Llame hoy mismo a Humana:
**1-800-537-3699 (TTY: 711)**
8 am - 8 pm, Monday - Friday
Y0040_GHHHS8GEN_RS Accepted 12212013

331

Dept.



"Venezuela rechaza enérgicamente la Carvajal son los primeros que vinculan a que su organización exp...

# Uno de los encausados se declara in

**DROGAS** VIENE DE LA PÁGINA 1A

tar, Hugo Carvajal Barrios, quien fue arrestado en Aruba a principios de la semana.

Todavía no se sabe si Carvajal, cuyo arresto fue condenado por el gobierno venezolano, acabará ante el juzgado federal de Miami como Palmeri-Bacchi. El es el cónsul general pendiente de Venezuela en la isla caribeña.

En un encausamiento abierto el jueves, Carvajal está siendo acusado de ayudar a capos colombianos como el difunto Wilber Varela por medio de permitirles exportar sus cargamentos de cocaína desde Venezuela, protegerlos contra su captura, y brindarles información sobre las investigaciones de las fuerzas armadas y la policía venezolanas. A cambio, Varela pagaba sobornos al ex director de inteligencia militar y otros oficiales de alto rango de las fuerzas armadas y la policía.

Carvajal y otros funcionarios venezolanos no nombrados están acusados de invertir en los envíos de los carteles a Estados Unidos, de acuerdo con el encausamiento. En particu-

lar, el mismo alega que Carvajal vendió 100 kilos de cocaína a un miembro de la facción de Varela en el llamado Cartel del Norte del Valle en Colombia.

Varela, quien había trasladado su operación de cocaína a Venezuela en el 2004 para evadir su captura, fue muerto en el 2008 — pero la red de sobornos entre algunos de los principales oficiales militares de Chávez y los carteles continuó durante el 2010, de acuerdo con el encausamiento, que se presentó sellado en mayo del 2013.

Carvajal está en la lista negra del Departamento del tesoro de EEUU, bajo "regulaciones de capos extranjeros de narcóticos". El es uno de un puñado de oficiales de las fuerzas armadas venezolanas en la lista.

El miércoles por la noche, las autoridades de Aruba detuvieron a Carvajal, de 54 años, bajo alegaciones de narcotráfico y de ayuda a las guerrillas colombianas. Carvajal fue detenido a petición de las autoridades estadounidenses que han solicitado su extradición, según se enteraron el Miami Herald y el

Nuevo Herald.

La fiscalía espera que Carvajal se opondrá a ser extraditado y traído a Miami a enfrentar cargos de conspiración de drogas.

Carvajal fue un confidente cercano del difunto presidente Chávez, quien murió en el 2013, y dirigió el aparato de inteligencia del país del 2004 al 2009. A principios del presente año, el presidente Nicolás Maduro lo designó como cónsul general en Aruba, pero se reporta que el gobierno de los Países Bajos todavía no ha aceptado su posición.

El jueves, el gobierno de Venezuela calificó la detención de Carvajal de "ilegal y arbitraria", y dijo que el funcionario estaba protegido por su estatus diplomático.

En un comunicado, el Ministerio de Relaciones Exteriores de Venezuela dijo que había "activado todos los mecanismos diplomáticos para que se corrija esta grave violación del Derecho Internacional", y pidió a los Países Bajos que lo liberen de inmediato.

El Ministerio de Relacio-

nes Exteriores expresó "su deseo de evitar que esta acción pueda devenir en el deterioro de las relaciones diplomáticas, económicas, energéticas y comerciales sostenidas actualmente".

El abogado defensor de Palmeri-Bacchi se negó a comentar acerca del caso de su cliente. El abogado, Edward Abramson dijo sólo que a Palmeri-Bacchi "le habían tendido una trampa" cuando fue arrestado el viernes pasado en el Aeropuerto Internacional de Miami.

La esposa y el hermano del ex juez y otras personas se presentaron el jueves para su lectura de cargos, pero también se negaron a hacer declaraciones a la salida del juzgado. Su esposa lloraba abiertamente, y los demás la consolaban.

Se presentaron cargos contra Palmeri-Bacchi en encausamiento sellado en diciembre del 2013 de conspirar con el ex director de Interpol, McTurk, quien todavía se encuentra en Venezuela, para ayudar a trasladar miles de kilos de cocaína a través de ese país con destino a Estados Uni-

dos para un na... biano ahora co... me Alberto Zamora.

Marín-Zamo... los lugartenien... ción del Norte... Varela, fue enca... 2009 por un gra... deral de Miami... traditado el año... se declaró culp... cargo de conspi... tráfico de droga... y fue condenad... de cárcel.

Palmeri-Bac... trabajó como ju... abogado en Ver... acusado tambié... de dinero y co... para la obstru... justicia, además... sión. Se alega q... a un hombre id... como J.C.S. y a... "con fuerza, vic... rror" para saca... propiedades. J.C... crito en el enca... como propietar... compañía de bi... y una escuela p... dores inmobilia...

El fiscal fede... Richard Grego... ba hacer una pr... en la audienci...

---

# Llega a $7 millones la mu

**TUNEL** VIENE DE LA PÁGINA 1A

"Para ser honestos, es decepcionante ver nuestra obra desgarrada de esa manera", dijo un Hodgkins aún apesadumbrado.

El primer tubo quedó triturado y ... varios lugares por la ma-



EL NUEVO HERALD
Friday July 25th 2014

VENEZUELA - ARUBA
**THEY CAPTURE EX-MILITARY KEY PLAYER IN THE TRAFFICK OF NARCOTICS**
**Hugo Carvajal is detained, Ex-chief of Chavez's military intelligence**
**-page 2-**
**They encaused in USA members of the Chavez government (Chavistas) for giving protection to traffickers.**

by Jay Weaver - jweaver@miamiherald.com


A former Venezuelan judge and his family flew to Miami international airport with plans to spend a two week prepaid vacation in Disney World.

Benny Palmeri Bacchi never made it to the theme park in Orlando.

He was one of the three Venezuelans indicted in a Federal case of drug trafficking that- for the first time- links high ranking officials from the administration of the now desceased president Hugo Chavez with leaders from the Venezuelan cartels, confirmed the prosecutors office on Thursday. The former officials are accused of accepting bribes in exchange for allowing traffickers to move shipments of cocaine via plane from Venezuela to Mexico and the Caribean for its distribution in the United States.

On Thursday, Palmeri Bacchi , 46 years old - plead innocent in the Miami Federal courthouse - of providing protection to a convicted Colombian drug trafficker that moved shipments of cocaine from Venezuela to the United States.

The former judge, accused of interfering with the extradition process of the trafficker, is in the center of a criminal investigation kept secret for a long time, centered in a former director of the Venezuelan Interpol, Rodolfo McTurk, as well as a former director of military intelligence, Hugo Carvajal Barrios, who was arrested in Aruba at the begining of the week.

We still dont know if Carvajal, whose arrest was condemned by the Venezuelan government, will end up in front of a Federal jury in Miami like Palmeri Bacchi. He is the pending general Chanciller of Venezuela in the caribean island.

In an indictment opened on Thursday, Carvajal is being accused of

helping Colombian drug lords such as the desceased Wilber Varela by allowing them to export their loads of cocaine from Venezuela, protecting them from being captured, and providing them with information in regards to investigations from the armed forces and the Venezuelan police. In exchange, Varela paid bribes to the former director of military intelligence and other high ranking officials of the armed forces and the police.

Carvajal and other Venezuelan officials not mentioned are accused of investing in the shipments from the cartels to the United States, according to the indictment. In particular, it claims that Carvajal sold 100 kilos to a member of the Varela's group in the so called "Cartel of North of the Valley" in Colombia.

Varela, who had moved his cocaine operation from Colombia to Venezuela in 2004 to avoid being captured, was killed in 2008 - but the bribe network between some of the main officials from the Chavez military and the cartels continued during 2010, according to the indictment that was presented under seal in May 2013.

Carvajal was in the black list of the Department of the Treasure of the United States under "Regulations for foreign drug lords". He is one of the handfull of officials from the armed forces of Venezuela that are in the list.

On Wednesday night, the Aruban authorities detained Carvajal, 54 years old, under allegations of drug trafficking and helping the Colombian guerrilla. Carvajal was detained per the United State's authorities request that have solicited his extradition, as the Miami Herald and Nuevo Herald found out.

The prosecution expects that Carvajal will contest being extradited and brought to Miami to face charges of Conspiracy of Drug Trafficking.

Carvajal was a close confident of the now desceased president Chavez, who died in 2013, and also directed the country's intelligence from 2004 to 2009. At the begining of the current year, president Nicolas Maduro designated him as general chanciller in Aruba, but it is reported that the government of the lower countries have not accepted his position yet.

On Thursday the Venezuelan government called Carvajal's detention as "illegal and arbitrary", and said that the official was protected by his diplomatic status.

In a press release from the Venezuelan Office of Exterior Relations said that it had activated all the diplmatic mechanisms in order for this major violation of the International Law to be corrected, and asked the lower countries to free him immediately.

The Department of Exterior Relations expressed "its desire to avoid that this action could damage the diplomatic, energy, economic and commercial relations currently held"

The defense attorney for Palmeri-Bacchi did not comment on his clients case. The attorney, Edward Abramson only said that Palmeri was "victim of a trap" when he was arrested last Friday at the Miami International airport.

His wife, brother and other people were present Thursday for the reading of his charges, but also declined to comment at the courthouse exit. his wife cried openly and the other people comforted her.

The charges against Palmeri, in the indictment sealed in december 2013 are of conspiring with the former director of Interpol, McTurk, who is still in Venezuela, to help move thousands of kilos of cocaine through that country to the United States for a now convicted drug trafficker, Jaime Alberto Marin Zamora.

Marin Zamora, one of the leutenants of the Varela's cartel of the North of the Valley, was indicted in 2009 by a Federal grand jury in Miami. He was extradited the following year, pled guilty of one charge of conspiracy to traffick drugs in 2011 and was sentenced to 16 years in prison.

Palmeri-Bacchi, who worked as a judge, prosecutor and attorney in Venezuela, was accused of money laundering and conspiracy of obstruction of justice, as well as extortion. It is alleged that he threatened a man identified as J.C.S. and his family with "force, violence and terror" to get money and property from him. J.C.S. was described in the indictment as an owner of a Real Estate company as well as a Real Estate school.

Federal prosecutor Richard Gregorie planned to make a presentation at the bond hearing of the Venezuelan judge on Thursday that would have shown that Palmeri-Bacchi had sent threatening emails to J.C.S. with attachments. The attachments included a video of somebody being killed real time as well as images of inmates being sadomized in a Venezuelan prison.

Magistrate Judge Chris McAliley postponed the bond hearing after the attorney for the defense agreed with the prosecution on the detention prior to the trial, based on flight risk and endangerment to the community. There is no date for when the bond hearing will be held.

The prosecution is also trying to seize 2.5 million dollars from accounts of Palmeri-Bacchi and McTurk, the former director of interpol, in three banks in Miami:

Wells Fargo, Espiritu Santo and Banco Santander International.

**Reporters Jim Wyss from Miami Herald and Antonio Delgado from El Nuevo Herald contributed to this story.**

TRULINCS  66858054 - SANCHEZ, JUAN CARLOS - Unit: COL-A-C

-----------------------------------------------------------------------------------------------------

smaller

Larger
By DAN MOLINSKI
Updated July 25, 2014 9:49 p.m. ET

Former Venezuelan Chief of Military Intelligence Hugo Carvajal is shown in this handout photo during a meeting in Caracas, on March 1, 2013. European Pressphoto Agency
A Venezuelan official arrested this week on the Caribbean island of Aruba will remain jailed awaiting possible U.S. extradition on drug-trafficking charges, after a judge Friday rejected his claims of diplomatic immunity.

Hugo Carvajal, a retired general who was a confidant to Venezuela's late President Hugo Chávez, was detained at the request of U.S. officials when he arrived Wednesday night at Aruba's airport. He was slated to become Venezuela's consular general on the island, which is part of the Netherlands.

Venezuela blasted the arrest and demanded his immediate release, arguing Mr. Carvajal enjoyed diplomatic immunity that protected him from arrest in Aruba. But the judge at his initial hearing sided with Aruban prosecutors who pointed out that Mr. Carvajal was yet to be officially recognized by Aruba or the Netherlands as the Venezuela's consular general, and as such held no special diplomatic privileges. Mr. Carvajal has denied U.S. accusations of wrongdoing.

"The judge said our arrest of Mr. Carvajal was legal, that there is no diplomatic immunity in this case," Aruba's chief prosecutor, Peter Blanken, said late Friday, after the ruling was made. "Mr. Carvajal will remain behind bars here until he is extradited to the U.S."

Venezuelan President Nicolás Maduro late Thursday called the arrest of Mr. Carvajal a "kidnapping," and said his government would continue to fight for him to be quickly released from jail in Aruba and avoid extradition to the U.S. He has also threatened retaliatory action against Aruba, which has long held mostly good relations with both Venezuela and the U.S., and is located just off Venezuela's coast.

Chris LeJuez, Mr. Carvajal's lawyer in Aruba, said the judge's decision Friday wouldn't be "the end of the road," and said that once the U.S. formally requests extradition, another judge will review the case. He also said his client could file appeals that could delay any possible extradition for many months, at least.

The arrest in Aruba of Mr. Carvajal, who also previously served as Venezuela's military intelligence chief, makes him the highest-ranking Venezuelan official to be arrested on a U.S. warrant. It has already worsened relations between the Venezuela and the U.S.

Analysts say if the U.S. succeeds in getting Mr. Carvajal extradited to face U.S. justice, any testimony he provides could damage the Maduro government.

"Carvajal knows a lot about corruption in Venezuela," said Adam Isacson, a security-policy analyst at the Washington Office on Latin America, a think tank. "If he's extradited to the United States and cuts a deal, the information he provides would be hugely embarrassing to Venezuela."

U.S. counternarcotics officials have been investigating Mr. Carvajal for links to Colombian drug traffickers, and for allegedly working with them to smuggle cocaine to U.S. shores. Apart from Mr. Carvajal, the U.S. indictments also allege drug crimes by a former Venezuelan judge, Benny Palmeri-Bacchi who was arrested last week in Miami on drug-trafficking and other charges and a former high-ranking law-enforcement official.

Edward Abramson, a lawyer for Mr. Palmeri-Bacchi, said his client pleaded not guilty at the hearing in Miami on Thursday and is being held in solitary confinement. The attorney confirmed that Mr. Palmeri-Bacchi was arrested at Miami International Airport a week ago while en route with his family to Disney World.

Mr. Abramson said Mr. Palmeri-Bacchi denied the allegations against him in the indictment. The lawyer accused the U.S. government of laying a trap for his client. He said Mr. Palmeri-Bacchi had initially been denied a visa by the U.S. embassy in Caracas. Days later, he said, the embassy called Mr. Palmeri-Bacchi back and said it had made a mistake and could issue him a visa. "It was a setup," Mr. Abramson said.

In 2008, the U.S. Treasury Department put Mr. Carvajal on a blacklist of alleged narcotics traffickers, which prohibited any

TRULINCS  66858054 - SANCHEZ, JUAN CARLOS - Unit: COL-A-C
--------------------------------------------------------------------------------

Americans from doing business with him.

Arian Campo-Flores contributed to this article.

ÚLTIMA HORA  →  Link to Noticias DolarToday Resumen diario de noticias (http://tururutururu.com/link-to-noticias-dolartoday-resu

# TURURU
# tururu.com (http://tururutururu.com/)

🐦 (https://twitter.com/tururunes)   f (https://www.facebook.com/Tururunes)

▶ (https://www.youtube.com/channel/UC6l4p32pjkcxa6-w6jlt7vg)   Q

Inicio (http://tururutururu.com/)    Berenice Gómez (http://tururutururu.com/category/labi/)

Política (http://tururutururu.com/category/politica/)

Internacional (http://tururutururu.com/category/internacional/)

Justicia (http://tururutururu.com/category/justicia/)

Ciudadanía (http://tururutururu.com/category/politiqueando/)

Opiniones (http://tururutururu.com/category/opiniones/)

Predicciones (http://tururutururu.com/category/astrologia/)

Paradigma (http://tururutururu.com/category/paradigma/)

Tecnología (http://tururutururu.com/category/tecnologia/)

JUSTICIA (HTTP://TURURUTURURU.COM/CATEGORY/JUSTICIA/)

# PRUEBAS: Ex Juez Palmeri preso en EEUU es millonario y "enlace internacional" de Mercosur Nueva Esparta 26/07/2014 |



Apoyemos a "La Bicha"

$2,766 of $15,000

Organized by Mariana Santacruz

71    779

POR COLABORADORES (HTTP://TURURUTURURU.COM/AUTHOR/ADMIN/) EL 27 JULIO,
2014 (HTTP://TURURUTURURU.COM/PRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-
MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-MERCOSUR-NUEVA-ESPARTA-26072014/)

f   FACEBOOK (HTTP://WWW.FACEBOOK.COM/SHARE.PHP?U=HTTP%3A%2F%2FTURURUTURURU.COM%2FPRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-M
    ESPARTA-                                                                                                                    (https://twitter.com/Tururunes?
    26072014%2F&TITLE=PRUEBAS:%20EX%20JUEZ%20PALMERI%20PRESO%20EN%20EEUU%20ES%20MILLONARIO%20Y%20ENLACE%20INTERNACIONAL%20DE%20MERCOSUR%20NUEVA%20ESPARTA%2  ref_src=twsrc%5Etfw)

g   GOOGLE PLUS (HTTPS://PLUS.GOOGLE.COM/SHARE?URL=HTTP%3A%2F%2FTURURUTURURU.COM%2FPRUEBAS-
    EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-MERCOSUR-NUEVA-
    ESPARTA-26072014%2F)

🐦   TWITTER (HTTPS://TWITTER.COM/INTENT/TWEET?URL=HTTP%3A%2F%2FTURURUTURURU.COM%2FPRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-
    MERCOSUR-NUEVA-ESPARTA-
    26072014%2F&TEXT=PRUEBAS%3A+EX+JUEZ+PALMERI+PRESO+EN+EEUU+ES+MILLONARIO+Y+%E2%80%9CENLACE+INTERNACIONAL%E2%80%9D+DE+MERCOSUR+NUEVA+ESPARTA++26%2F07%2F201

PINTEREST (HTTP://PINTEREST.COM/PIN/CREATE/BUTTON/?URL=HTTP%3A%2F%2FTURURUTURURU.COM%2F2PRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-26072014%2F&MEDIA=&DESCRIPTION=PRUEBAS:%20EX%20JUEZ%20PALMERI%20PRESO%20EN%20EEUU%20ES%20MILLONARIO%20Y%20"ENLACE%20INTERNACIONAL"%20DE%20MERCOSUR%20NUEV

LINKEDIN (HTTP://WWW.LINKEDIN.COM/SHAREARTICLE?MINI=TRUE&URL=HTTP%3A%2F%2FTURURUTURURU.COM%2F2PRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-26072014%2F&TITLE=PRUEBAS:%20EX%20JUEZ%20PALMERI%20PRESO%20EN%20EEUU%20ES%20MILLONARIO%20Y%20"ENLACE%20INTERNACIONAL"%20DE%20MERCOSUR%20NUEVA%20ESPARTA%2

CORREO ELECTRÓNICO: (MAILTO:?SUBJECT=PRUEBAS: EX JUEZ PALMERI PRESO EN EEUU ES MILLONARIO Y "ENLACE INTERNACIONAL" DE MERCOSUR NUEVA ESPARTA 26/07/2014

&BODY=HTTP://TURURUTURURU.COM/PRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-MERCOSUR-NUEVA-ESPARTA-26072014/)

Hmmm...ca
this page

Try this

- Make sure yo
  right web add
  https://w.sou

- Search for
  "https://w.sou
  on Bing

- Refresh the p

Details



**TOMADO DE EL VENEZOLANO**-Un ex juez venezolano y su familia volaron al aeropuerto internacional de Miami, con planes pre pagados de pasar dos semanas de vacaciones en Disney World.

Pero **Benny Palmeri Bacchi**-nunca llegó al parque temático de Orlando.

Él es uno de tres venezolanos acusados en casos federales de narcotráfico que vinculan por primera vez los ex funcionarios de alto rango en la administración del fallecido presidente **Hugo Chávez a jefes de los carteles colombianos**, los fiscales dijeron el jueves.

Los ex funcionarios son acusados de aceptar sobornos a cambio de permitir que los traficantes hicieran envíos de cocaína desde Venezuela a México y el Caribe para su distribución en los Estados Unidos.

El jueves, Palmeri-Bacchi, de 46 años, se declaró (No) culpable en una corte federal de Miami para brindar protección a un narcotraficante colombiano condenado que movía cargamentos de cocaína desde Venezuela a los Estados Unidos.

El juez es acusado de bloquear la extradición de un narcotraficante, por lo que ha estado en el centro de una investigación criminal de larga data y bajo secreto dirigidas a un ex director venezolano Interpol, Rodolfo McTurk, así como un ex jefe de la inteligencia militar, Hugo Carvajal Barrios, quien fue detenido en Aruba.

Si Carvajal, cuya detención fue condenada por el gobierno venezolano, termina en Miami como Palmeri Bacchi-queda por ver, aunque unos dicen que ira a Nueva York, otros Washington DC.

En una acusación abierta hoy jueves, Carvajal está acusado de ayudar a narcotraficantes colombianos mienbros de la red del fallecido Wilber Varela alias "Jabon" asesinado en un hotel de Merida en Venezuela por un grupo comando.

No obstante, el General Carvajal y sus cómplices fueron miembros de la organización permitiéndoles exportar sus cargamentos de cocaína desde Venezuela, protegiéndolos de ser capturado, y les proporciona información sobre militares venezolanos y las investigaciones policiales, a cambio, Varela



(http://www.officeboyexpress.com.co.)

pagó sobornos al ex director de inteligencia militar y otros funcionarios militares y policiales de alto rango.

Carvajal y otros funcionarios venezolanos no identificados están acusados de invertir en los envíos de los carteles a los Estados Unidos, dijo la acusación, en particular, alega que Carvajal vendió 100 kilos de cocaína a un miembro de la facción de Varela en el llamado cartel del Norte del Valle en Colombia.

Varela, quien se había mudado de su operación de cocaína desde Colombia a Venezuela en 2004 para evitar su captura, fue asesinado en 2008 -, tras el pago de soborno entre algunos de los altos funcionarios militares de Chávez y los carteles continuó hasta el año 2010, de acuerdo con la acusación presentada en secreto en mayo de 2013.

Carvajal está en la lista negra del **Departamento del Tesoro de EE.UU. bajo los "reglamentos de sanciones Cabecillas Extranjeros** del Narcotráfico." Es uno de un puñado de oficiales militares venezolanos en la lista.

La noche del miércoles, las autoridades de Aruba detuvieron a Carvajal, de 54 años, por acusaciones de tráfico de drogas y ayudar a las guerrillas colombianas. Carvajal se llevó a cabo a petición de las autoridades estadounidenses que han solicitado su extradición.

Los fiscales esperan Carvajal para luchar contra su extradición para enfrentar cargos de conspiración de drogas en Miami.

Carvajal fue un cercano confidente, colaborador, y hombre de alta confianza del difunto presidente Chávez, quien murió en 2013, y fue el jefe del aparato de inteligencia del país desde 2004 hasta 2009.

A principios de este año,  Nicolás Maduro de **un plumazo lo nombró cónsul general en Aruba, pero, según informes del gobierno** de los Países Bajos aún habían dado el beneplácito precisamente por los entecedentes oscuros de Carvajal que para nadie en era un secreto de sus actividades de narcotraficante junto a las FARC y narcos colombianos.

El gobierno de Maduro ha manifestado su contundente protesta contra Holanda por la detención de su hombre de confianza, General Hugo Carvajal la cual calificó "ilegal y arbitraria", y dijo que el oficial estaba protegido por su estatus diplomático, aunque Carvajal intentó ingresar a la **isla de Aruba con un pasaporte falso con otra identidad pero al ver que estaba siendo** arrestado procedió a entregar el documento diplomático, ambos documentos están en manos de las autoridades de la isla.

En un comunicado, el Ministerio de Relaciones Exteriores de Venezuela dijo que estaba "activando todos sus mecanismos diplomáticos para corregir esta grave violación de los derechos internacionales" y pidió a los Países Bajos por su liberación inmediata.

"Esperamos que esta acción no conduce al deterioro de nuestros, económicos, energéticos y comerciales las relaciones diplomáticas actuales", dijo el Ministerio de Relaciones Exteriores.



(https://www.instagram.com/drillfs/)



(mailto:lacomidademamaita@gmail.com)

Mientras tanto, el jueves, el abogado **defensor de la ex juez venezolano, Palmeri-Bacchi,** se negó a comentar sobre el caso de su cliente.

Abogado Edward Abramson se limitó a decir-**Palmeri Bacchi "entró en una trampa para osos",** cuando fue detenido en el Aeropuerto Internacional de Miami el pasado viernes.

Esposa, hermano y otros familiares del ex juez se reunieron para su comparecencia el hoy jueves en la corte Federal de Miami, pero también se negó a decir nada fuera de la sala.

**Palmeri-Bacchi fue acusado en un encusamiento secreto en diciembre de 2013 bajo la acusación de conspirar con el ex director de la Interpol, McTurk, que todavía está en Venezuela, para ayudar a mover miles de kilos de cocaína a través de ese país a los Estados Unidos por un traficante colombiano ahora condenado- , Jaime Alberto Marín Zamora.**

Marin-Zamora, teniente de North Valley facción de Varela, fue acusado en 2009 por un gran jurado federal de Miami. Fue extraditado el año siguiente, se declaró culpable de un **cargo de drogas-conspiración en 2011 y fue condenado a 16 años**de prisión.

Palmeri-Bacchi, que trabajó como jùez, fiscal y abogado en Venezuela, también fue acusado de lavado de dinero y obstrucción de la justicia conspiraciones, junto con la extorsión. Él supuestamente amenazó a un hombre identificado como JCS y su familia "con la fuerza, la violencia y el miedo" para obtener dinero y la propiedad de él. JCS fue descrito en la acusación como el dueño de una compañía de bienes raíces y la escuela de bienes raíces.

**Fiscal Asistente de EE.UU.** Richard Gregorie previsto poner una presentación para la audiencia de fianza de la venezolana jueves que habría mostrado Palmeri Bacchi-supuestamente enviado correos electrónicos amenazantes a JCS con archivos adjuntos.

Esos anexos incluyen un video de alguien realmente ser asesinado, así como imágenes de prisioneros sodomizado en una cárcel venezolana, de acuerdo con las discusiones escuchadas fuera de la sala.

Magistrado Juez Chris McAliley pospuso la audiencia de fianza después el abogado del acusado accedió temporalmente a la petición del fiscal de la detención antes del juicio, en base a un riesgo de fuga y peligro a la comunidad. No se ha fijado fecha para la audiencia de fianza.

Los fiscales también están tratando de apoderarse de **$ 2,5 millones de cuentas abiertas por Palmeri-Bacchi y McTurk, el ex director de la Interpol, a los tres bancos en Miami: Wells Fargo, Espirito Santo y Banco Santander International.**

Con informacion de El Venezolano y The Miami Herald (http://www.miamiherald.com/2014/07/24/4252811/feds-charge-former-high-ranking.html)

## BIOGRAFIA

### Benny Palmeri Bacchi



### 29-06-1968

Abogado -ex juez y ex fiscal-, de 46 años, acusado de colaborar con el traslado de cargamentos de cocaína hacia Estados Unidos a través de aviones venezolanos, en complicidad con el ex director de Interpol, Rodolfo Mc Turk, y el ex director de la inteligencia militar venezolana, Hugo Carvajal, detenido el 24 de julio de 2014 en Aruba –a solicitud de Estados Unidos- por su participación en las actividades de narcotráfico de la guerrilla colombiana. Según medios internacionales, Palmeri fue arrestado ese mismo día en el Aeropuerto Internacional de Miami cuando viajaba junto a su familia rumbo a Disney World –Orlando, estado de Florida- y se declaró inocente ante un tribunal federal de Miami. Su abogado, Edward Abramson, declaró que le tendieron una "trampa" a su cliente. También pesan sobre Palmeri otras acusaciones: lavado de dinero, obstrucción de la justicia y extorsión. El Nuevo Herald indicó que la Fiscalía planea confiscarle 2,5 millones de dólares de sus cuentas. La ciudad de Orlando, el destino de su viaje interrumpido, es más que un lugar de vacaciones para Palmeri. También es sede de sus negocios: allí están registradas cuatro empresas que estuvieron bajo su gerencia. Figuró como socio gerente de las compañías BTMS LLC, Abes LLC y Bsmt LLC, todas fundadas el 8 de abril de 2009, como sociedades de responsabilidad limitada del estado de Florida, actualmente inactivas. También fue presidente de la empresa Hokkaido Restaurant & Hoteles Inc. creada en junio de 2011 –también en Orlando- y aún activa bajo la presidencia de Ángel Palmeri. En las otras empresas igualmente aparecen gerentes de su mismo apellido: Marianne Palmeri y Simone Palmeri. En Venezuela, Palmeri es presidente de la empresa BTMS, C.A, con sede en Nueva Esparta, creada en 2012 para la elaboración de comida para ventas al mayor y al detal, e importación y exportación de mercancía, según señala su expediente en el Registro Nacional de Contratistas (RNC). No se reporta, sin embargo, ningún contrato con el Estado. Asimismo ocurre con la empresa BTS 2008, C.A., también presidida por Palmeri y creada en el mismo registro mercantil - Segundo de Nueva Esparta-, en la misma fecha, con el mismo capital - 135.000 millones de bolívares-, ubicada en la misma oficina y con el mismo objetivo: preparación y venta de comida. También aparece en el RNC sin ningún contrato. La Asociación Cooperativa Alimentos Bolivarianos Del Caribe 2013, R.L es otra compañía de Nueva Esparta con su nombre en el expediente del RNC, esta vez con el cargo de coordinador de educación, con el 20% de las acciones. La cooperativa fue creada en marzo de 2013 y también está relacionada con la producción de alimentos. Palmeri, además, fue juramentado en 2013 como director de Enlace Internacional de la Junta Directiva de la Cámara de Comercio de Empresarios del Mercosur Venezuela, capítulo Nueva Esparta. Por otra parte, un expediente del Tribunal Supremo de Justicia – sobre una demanda en 2010 por la resolución de un contrato- da cuenta de su participación como representante legal en la compañía Seba Invest Inversiones C.A., inscrita en Caracas.

FUENTE http://www.poderopedia.org (http://www.poderopedia.org/)

**Cadena perpetua en EEUU podría recibir ex juez venezolano (documento exclusivo)**

(NoticiasVenezuela) Las acusaciones contra Palmeri y McTurk **las realizó el Fiscal Federal Wilfredo A. Ferrer en la Corte del Distrito Sur de La Florida el 19 de diciembre de 2013.**

En su "Indictment" (acusación) el Fiscal Federal Ferrer, asistido de los fiscales auxiliares Richard D. Gregorie y Adam S. Fels, hace una detallada descripción de la participacion de Palmeri y McTurk en las actividades delictivas de tráfico de drogas para el cártel del colombiano Jaime Alberto Marin Zamora.

Entre los cargos, tanto Palmeri como McTurk podrían enfrentar la condena a cadena paerpetua por "*Conspiración para distribuir cocaína importada en EEUU*".

**Palmeri-Bacchi, Benny Indictment.pdf (http://www.scribd.com/doc/235164224)**

# Comentarios:

ESTA ENTRADA SE PUBLICÓ EN JUSTICIA (HTTP://TURURUTURURU.COM/CATEGORY/JUSTICIA/). ENLACE PERMANENTE (HTTP://TURURUTURURU.COM/PRUEBAS-EX-JUEZ-PALMERI-PRESO-EN-EEUU-ES-MILLONARIO-Y-ENLACE-INTERNACIONAL-DE-MERCOSUR-NUEVA-ESPARTA-26072014/).

¿TE GUSTÓ? COMPARTE

Source: Tururu.com

EVIDENCE: FORMER JUDGE PALMERI IS INCARCERTAED IN U.S.A. IS A MILLIONAIRE AND "CONNECTED INTERNATIONALLY" WITH MERCOSUR IN THE STATE OF NUEVA ESPARTA (VENEZUELA)
07/26/2014


**Taken from El Venezolano Newspaper** - A former Venezuelan ex-judge and his family flew into Miami international airport with a two week all expenses paid trip planned for Walt Disney World.

But **Benny Palmeri Bacchi** never made it to the theme parks in Orlando.

He is one of the three Venezuelans accused in Federal cases of drug trafficking that, for the first time link high ranking officials from the government of the now desceased president **Hugo Chavez** to the Colombian cartels- the prosecutors said this Thursday.

The former officials are accused of accepting bribes in order to allow the drug lords to send shipments of cocaine from Venezuela to Mexico and the Caribbean in order to later distribute in the United States.

The judge is accused of blocking the extradition order of a drug trafficker, which made him the center of a long undercover investigation directed towards the former Venezuelan director of Interpol, Rodolfo McTurk, as well as the former director of Military intelligence, Hugo Carvajal Barrios, who was arrested in Aruba.

If Carvajal, whose detention was questioned by the Venezuelan government, ends up in Miami like Palmeri Bacchi is still to be seen, although some say that he will go to New York and others to Washington DC.

In a complaint filed today Thursday, Carvajal is accused of helping Colombian drug traffickers members of the network of the now desceased Wilber Varela a.k.a. "Jabon" who was murdered in a hotel in the State of Merida in Venezuela by an armed group.

Meanwhile, General Carvajal and his accomplices were members of the organization allowing them to export his shipments of cocaine from Venezuela, protecting them from being captured, and providing them with information about military and police investigations, in exchange, Varela paid bribes to the former director of military intelligence and other military officials and high ranking police officials.

Carvajal, and other non-identified Venezuelan officials are accused of investing in the shipments that the cartels sent to the United States, said the indictment, in particular, it says that Carvajal sold 100 kilos of cocaine to a member of the Varela group in the known "Cartel del Norte del Valle" in Colombia.

Varela, who had moved his operation from Colombia to Venezuela in 2004 to avoid his capture, was murdered in 2008 - but the bribes between high ranking officials from Chavez and the cartels continued until the year 2010, according to the indictment filed in secret in May 2013.

Carvajal is in the black list of the **Department of the Treasure in the United States under the "sanction rules of Drug Trafficking foreign leaders".** He is one of the handfull of Venezuelan military officials that are on the list.

Wednesday night, the Aruba authorities arrested 54 year old Carvajal, for accusations of drug trafficking and aiding the Colombian guerrilla. This was done after the United States asked for his extradition.

The prosecutors expect that Carvajal will fight his extradition to face charges of drug trafficking in Miami.

Carvajal was a close confident, colaborator and high trusted man of the now desceased president Chavez, who died in 2013, and he was also the chief of the inteligence aparatus of the country from 2004 to 2009.

At the begining of this year, Nicolas Maduro, in a quick use of the pen named him General Chanciller in Aruba, but, according to reports from the governments of the Lower Countries they still had not confirmed his appointment due to the dark background of Carvajal since his drug trafficking activities with the FARC and the Colombian cartels were not a secret.

Maduro's government has expressed its protest against Holland for the arrest of his trusted allied General Hugo Carvajal, and he labeled it as "illegal and arbitrary", and said that the official was protected by his diplomatic status - although Carvajal attempted to enter Aruba with a fake passport and another identity, but when he realized that he was being arrested he provided the diplomatic document. Both documents are in possession of the island authorities.

In a press release, the Foreign Relations Department in Venezuela said that it was "activating all diplomatic mechanisms to correct this grave violation of the international laws" and asked the lower countries for his immediate release.

"We expect that this action doesn't lead to the damage of our economic, energy and commercial relationships" said the Foreing Relations Department.

Meanwhile, on Thursday the attorney for the former Venezuelan judge Palmeri-Bacchi had no comments about the case of his client.

Attorney Edward Abramson just said that "Palmeri Bacchi walked into a bear trap" when he was arrested in the Miami Iternational Airport last Friday.

His wife, brother and other family members of the former judge met for his hearing today Thursday at the Federal courthouse in Miami, however he declined to comment outside of the court.

Palmeri Bachi was charged in a secret indictment in December 2013 under the charges of conspiring with the former director of Interpol, McTurk, who is still in Venezuela,

to help move thousands of kilos of cocaine through that country to the United States for a now incarcerated Colombian drug trafficker, Jaime Alberto Marin Zamora.

Marin-Zamora, leutenant of the North Valley group of Varela, was indicted in 2009 by a Federal grand jury in Miami. Was extradited the following year, pled guilty of one count of conspiracy to trafficks drugs in 2011 and was sentenced to 16 years in prison.

Palmeri-Bacchi, who worked as a judge, prosecutor and attorney in Venzuela, was also accused of money laundry, and obstruction of justice, as well as extortion. Supposedly, he threatened a man identified as J.C.S. and his family with "force, fear and violence" to obtain money and property. J.C.S. was described in the indictment as the owner of a Real Estate company and a Real Estate school.

Assistant United States Prosecutor Richard Gregorie planned to have a presentation for the bond hearing of the Venezuelan, in there he would had shown that Palmeri-Bacchi supposedly sent threatening emails to J.C.S. with attached files.

Those attachments included a video of somebody being murdered, as well as images of inmates sadomizing another one in a prison in Venezuela, according to the conversations heard outside of the courtroom.

Magistrate Judge Chris McAlley postponed the bond hearing after the attorney for the defendant agreed with the prosecution in regards to the flight risk and danger to the community. There is no date for the next bond hearing.

The prosecution is also trying to obtain 2.5 million dollars in accounts opened by Palmeri-Bacchi and McTurk, the former director of interpol in the three Miami banks, Wells Fargo, Espiritu Santo and Banco Santander International.

**This report was confirmed by "el Venezolano" and the "Miami Herald" news paper.**

TRULINCS  66858054 - SANCHEZ, JUAN CARLOS - Unit: COL-A-C

--------------------------------------------------------------------------------

FROM:
TO:
SUBJECT:
DATE: 07/27/2014 08:36:11 PM

Www.talkleft.com
No Treaty, No Problem for the DEA

By Jeralyn, Section Crime Policy
Posted on Sat Jul 26, 2014 at 07:37:27 PM EST
Tags: Hugo Carvajal Barrios, Benny Palmeri-Bacchia, Venezuela (all tags)
Share This: Digg!
Venezuela does not allow the extradition of its citizens to the U.S. That doesn't stop the DEA. The latest conquests in its global war on drugs: Benny Palmeri-Bacchia, a Venezuelan attorney who served as a judge and prosecutor, and Hugo Carvajal Barrios, aka "Pollo" (chicken), the former head of Venezuela's Military Intelligence. Palmeri-Bacchi was arrested en route to Disneyland with his family for a vacation, and Carvajal was arrested in Aruba (as the result of a year long DEA plan to arrest him outside of Venezuela, more on this below).

Caravjal was arrested when he arrived in Aruba this week to assume duties in his new job as a consular official for Venezuela. He should have had diplomatic immunity, but the Netherlands, which controls Aruba, claimed it never approved his appointment, and an Aruban judge Friday upheld his detention for extradition to the U.S. on the arrest warrant in Caravjal's Miami case. The President of Venezuela is outraged, and says Caravjal was kidnapped.

They are indicted in separate cases in Miami. Essentially, Caravjal isaccused of accepting bribes from drug traffickers to fly cocaine shipments from Venezuela to Mexico and the Caribbean for distribution in the United States. They served in the Government of Hugo Chavez.

Benny Palmeri is indicted with former Venezuelan Interpol director, Rodolfo McTurk, who apparently remains at large, probably in Venezuela. The indictment largely stems from information provided by former Norte de Valle cartel leader Jaime Marin Zamora, who cooperated with the U.S. and is serving a 16 year sentence. In one count they are accused of obstructing Marin Zamora's extradition to the U.S. Palmeri is also charged with drug crimes, money laundering, and threatening the owner and operator of a realty company and a real estate school, who is referred to as "J.C.S."

Prosecutors in Miami seize $2.5 million from two Venezuelans
By Andrea Torres, Local10.com Reporter, atorres@local10.com
Published On: Jul 29 2014 04:02:41 PM EDT
Updated On: Jul 29 2014 04:17:05 PM EDT
Share on facebook Share on twitter Share on google_plusone_share

MIAMI -
Prosecutors in Miami Tuesday were moving to seize about $2.5 million from two prominent Venezuelan Chavistas linked to drug trafficking.

The bank accounts of Hugo Carvajal and Benny Palmeri-Bacchi are in Wells Fargo and Espirito Santo Bank, a federal prosecutor said. Both men were accused of helping the Colombian North Valley Cartel to ship cocaine to the U.S.

In a 2013 indictment Carvajal -- the former head of Venezuelan military intelligence -- was accused of working with the cartel to ship cocaine from 2004 to 2008. The U.S. Treasury Department also accused Carvajal in 2008 of funneling weapons to the Revolutionary Armed Forces of Colombia.

Carvajal was the consul general of Aruba, the beach destination of the government's elite. Authorities of the former Dutch colony arrested him July 22 on a U.S. warrant. U.S. officials accused Venezuelan President Nicolás Maduro of strong-arming Aruba into releasing Carvajal Sunday, The Wall Street Journal reported Monday.

Palmeri-Bacchi -- a former Venezuelan judge -- was arrested Friday in Miami on his way to a vacation at Walt Disney World, the Miami Herald reported. Bacchi, 46, is facing conspiracy to obstruct justice, money laundering and extortion charges; the report said.

Maduro hosted a welcome party for Carvajal. Palmeri-Bacchi was not so lucky.  He plead not guilty to the charges in federal court in Miami.

OPINION:  Read Helena Poleo's recent column

Copyright 2014 by Local10.com. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

☰   🖼   ☼           𝕸𝖎𝖆𝖒𝖎 𝕳𝖊𝖗𝖆𝖑𝖉                              👤

Get a Quote

MIAMI-DADE COUNTY

# Ex-Venezuelan judge pleads guilty in Miami drug case linked to Chávez government

BY JAY WEAVER

JWEAVER@MIAMIHERALD.COM

🐦  f  ✉  ➦

OCTOBER 23, 2014 09:23 AM,

UPDATED NOVEMBER 06, 2014 09:38 AM

An ex-Venezuelan judge who was arrested this summer on drug charges that for the first time linked former officials in the late President Hugo Chávez's administration to Colombian cartels pleaded guilty in Miami federal court on Wednesday.

The former judge and two other defendants still in Venezuela were accused of accepting bribes in exchange for allowing traffickers to fly cocaine shipments from Venezuela to Mexico and the Caribbean for distribution in the United States.



By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ad

Benny Palmeri-Bacchi, 46, who has been held in custody since July, pleaded guilty to conspiring to obstruct justice and launder drug proceeds, along with extortion. Under his plea agreement, prosecutors dropped the first charge of conspiring to import loads of cocaine.

Palmeri-Bacchi is scheduled to be sentenced on Feb. 6 before U.S. District Judge Ursula Ungaro.

## YOUR ALL ACCESS SUBSCRIPTION IS WAITING!

Enjoy 92% off your first month of digital access when you finish signing up today.

**SUBSCRIBE NOW**        **#READLOCAL**

He initially pleaded not guilty after he was arrested at Miami International Airport en route to a family vacation at Disney World in Orlando.

The one-time judge, who admitted that he of impeded a major drug trafficker's extradition to Miami, is at the center of a sensitive criminal investigation targeting a former Venezuelan Interpol director, Rodolfo McTurk, as well as a former military intelligence chief and general, Hugo Carvajal Barrios.

Carvajal was arrested in Aruba in July, but then allowed by Dutch authorities to return to Venezuela because of diplomatic immunity — to the dismay of U.S.



Gay man alleged hate-attack at South Beach Burger King



Bus driver recognized as hero

**VIEW MORE VIDEO →**

### TRENDING STORIES

**House Democrats tie DACA and TPS together in latest immigration push**

MARCH 06, 2019 12:09 PM

**Optometrist, sandwich king add to South Florida's stack of billionaires**

MARCH 06, 2019 01:43 PM

**Court weighs unsealing records that could reveal new details of Jeffrey Epstein sex abuse**

MARCH 06, 2019 09:03 PM

authorities. Carvajal, whose arrest was condemned by the Venezuelan government, had been appointed to become Venezuela's consul general to the Caribbean island.

Palmeri-Bacchi was indicted under seal in December 2013 on charges of conspiring with the former Interpol director, McTurk, who is still in Venezuela, to help move thousands of kilos of cocaine through that country to the United States for a now-convicted Colombian trafficker, Jaime Alberto Marin-Zamora.

Marin-Zamora, a lieutenant in the late North Valley cartel kingpin Wilber Varela, was indicted in 2009 by a Miami federal grand jury. He was extradited the following year, pleaded guilty to a drug-conspiracy charge in 2011 and was sentenced to 16 years in prison. Ever since, Marin-Zamora has been cooperating with prosecutors and the Drug Enforcement Administration in Miami.

Palmeri-Bacchi, who worked as a judge, prosecutor and attorney in Venezuela, was also charged with extortion in the Miami case. He threatened a man identified as J.C.S. and his family "with force, violence and fear" to obtain money and property from him, according to an indictment. J.C.S. was described in the indictment as the owner of a realty company and real estate school.

Assistant U.S. Attorney Richard Gregorie produced evidence showing that Palmeri-

**The change in weather is here, and parts of Florida are under a freeze warning**

MARCH 06, 2019 05:59 AM

**Dolphins considering choices for replacing Tannehill — one is worse than all the others | Opinion**

MARCH 07, 2019 01:32 AM



Bacchi sent threatening emails to J.C.S. with attachments. Those attachments included a video of someone actually being murdered as well as pictures of prisoners being sodomized in a Venezuelan jail.

Prosecutors are also seeking to seize $2.5 million from accounts held by Palmeri-Bacchi and McTurk, the ex-Interpol director, at three Miami banks: Wells Fargo, Espirito Santo and Banco Santander International.

In a separate indictment unsealed in July, Carvajal was accused of assisting Colombian kingpins such as Varela by allowing them to export their cocaine loads from Venezuela, protecting them from being captured, and providing them with information about Venezuelan military and police investigations.

In return, Varela paid bribes to the former military intelligence director and other high-ranking military and law enforcement officials.

Carvajal and other unnamed Venezuelan officials are accused of investing in the cartels' shipments to the United States, the indictment said. It alleges that Carvajal sold 100 kilos of cocaine to a member of Varela's faction in the North Valley cartel in Colombia.

Varela, who had moved his cocaine operation from Colombia to Venezuela in 2004 to avoid capture, was killed in 2008 --





but the bribery racket between some of Chávez's top military officials and the cartels continued through 2010, according to the indictment filed under seal in May 2013.

Carvajal is on the U.S. Treasury Department's blacklist under the "foreign narcotics kingpin sanctions regulations." He's one of a handful of Venezuelan military officials on the list.

Carvajal was a close confidant of the late President Chávez, who died in 2013, and led the country's intelligence apparatus from 2004 to 2009. Earlier this year, President Nicolás Maduro tapped him to be the consul general in Aruba.



Simple Project Management Tool

Done

Create Free Account

monday...

**FROM OUR ADVERTISING PARTNERS**



This is Why You Don't Hear About Chef Emeril Lagasse Anymore



Pat Sajak Responds to Alex Trebek's Cancer Diagnosis



Winona Ryder Is Not Letting Anyone Forget She's Married to Keanu



The Real Reason Hooters is Disappearing Across the Country



# Miami Herald



Freezing away fat cells with CoolSculpting™?

CRIME

# Former 'chief' in Venezuela national police charged with threatening 'dissident' in Miami

**BY JAY WEAVER**

JWEAVER@MIAMIHERALD.COM

MARCH 04, 2015 02:28 PM,
UPDATED MARCH 04, 2015 06:31 PM

A former senior official in Venezuela's national police agency has been arrested in Miami on a charge of issuing a chilling kind of death threat — a video showing a "graphic execution" by shotgun.

Orlando Blasini Escobar Mayora, stopped after his arrival at Miami International Airport, is accused of transmitting the video showing a man being killed with a shotgun blast to the head and multiple gunshots to the body. He allegedly sent the video to



MANSCAPED
Refining
THE GENTLEMAN

#1 IN BELOW-THE-WAIST GROOMING

GET MANSCAPED

By continuing to use this site, you give your consent to our use of cookies for analytics, personalization and ad

numerous contacts on his cellphone, authorities said.

"This is to scare you," a message attached to the video reads. It was included in a Department of Homeland Security Investigations complaint charging Escobar with transmitting the video.

Federal agents discovered the video on Escobar's cellphone after he was stopped on Sunday at MIA. In addition, they found that a "dissident" from Venezuela claimed he had received threatening voicemails from Escobar after he had spotted him at a Miami bakery in January, according to a Homeland Security affidavit.

## SIGN UP AND SAVE

Get six months of free digital access to the Miami Herald

**SUBSCRIBE WITH GOOGLE**          **#READLOCAL**

Escobar later left one cellphone message that allegedly threatened to hurt the man, who was granted asylum in the United States, "in the place where it would hurt ... the most." He left a follow-up message that allegedly said: "I swear to God, I will destroy you."

ADVERTISING



Florida officer hit by car while pursuing shoplifter



Woman steals $1,200 in tools from Broward Lowes

**VIEW MORE VIDEO →**

**TRENDING STORIES**

He exposed abuse at Florida immigrant detention center. Now he's in prison

MARCH 03, 2019 04:32 PM

It begins: Dolphins trying to trade Ryan Tannehill but details make it tough task

MARCH 02, 2019 12:31 PM

Corps looking to lower Lake O this rainy season to avoid fouling Florida coasts

MARCH 02, 2019 07:00 AM

inRead invented by Teads

**When he was 7, he was a viral video star. Now his college acceptance has gone viral.**

MARCH 02, 2019 12:28 PM

**His gang ripped off senior citizens for $2 million. This Parkland man just got prison time**

MARCH 03, 2019 09:57 AM

The unnamed target, who complained to federal authorities, said he interpreted these messages "to mean that Escobar was going to kill or hurt" him or his family, according to the Homeland Security affidavit. But the target was not among Escobar's contacts who received the snuff-like video, the affidavit said.

Escobar served in Venezuela's national police agency — that country's version of the FBI — during the era of the late President Hugo Chávez. In the affidavit, Escobar was described as a former "police chief" in the Chávez government.

He returned to Miami on Sunday and was ordered detained by a magistrate judge in federal court on Wednesday. Escobar, 47, awaits a bond hearing on March 20.

His defense attorneys, Michael Diaz and Robert Targ, jointly told the Miami Herald: "We're just investigating the allegations and have no comment until we've completed the investigation."

The Escobar case, prosecuted by Assistant U.S. Attorney Richard Gregorie, is the latest scandal surrounding an ex-official in the former Chávez government.

In prior cases, federal authorities have alleged that former military and other officials in that government provided protection for Colombian drug traffickers in exchange for kickbacks from cocaine-smuggling profits.

Last summer, Gregorie unveiled indictments linking former high-ranking officials in Chávez's administration to Colombian cartel bosses accused of exporting cocaine through Venezuela to the United States.

The prosecutor disclosed the cases after former Venezuelan judge Benny Palmeri-Bacchi was arrested at MIA in July.

Accused of impeding a major drug trafficker's extradition, Palmeri-Bacchi was at the center of a long-secret criminal investigation targeting a former Venezuelan Interpol director, Rodolfo McTurk, as well as a former military intelligence chief, Hugo Carvajal Barrios. The latter was arrested in Aruba but not turned over to U.S. authorities.

Palmeri-Bacchi, who worked as a judge, prosecutor and attorney in Venezuela, also was charged with money laundering and obstruction of justice conspiracies, along with extortion. He allegedly threatened a man identified as J.C.S. and his family



MANSCAPED
made in the USA
Refining THE GENTLEMAN

#1 IN BELOW-THE-WAIST GROOMING

GET MANSCAPED



Take charge of the conversation with your doctor.

64Z-1924526

Full Prescribing Information >    Medication Guide >

Use and Important Safety Information'
Who is HUMIRA for?
HUMIRA is a prescription medicine used to reduce signs and symptoms and to achieve and maintain clinical remission in adults with moderate to severe Crohn's disease who have not responded well to certain other medications. HUMIRA is also used to reduce signs and symptoms and achieve clinical remission in these adults who have lost

"with force, violence and fear" to obtain money and property from him. J.C.S. was described in an indictment as the owner of a Realty company and real estate school.

In court, Gregorie asserted that Palmeri-Bacchi sent threatening emails to J.C.S. with attachments. Those attachments included a video of someone being murdered as well as pictures of prisoners being sodomized in a Venezuelan jail.

After pleading guilty, Palmeri-Bacchi was sentenced last month to 6 1/2 years in prison.



Try us for $9.
10 custom stickers + free shipping
stickermule

**FROM OUR ADVERTISING PARTNERS**



The Untold Truth Of Michael Cohen's Daughter



This Is How Far Every Trump Got in School



Malia Obama's Boyfriend Comes From A Lot of Money



Key Patriots Coach Quits Amid Robert Kraft Scandal





MAY 19, 2015

# Feds widen probe of drug smuggling allegations against Venezuelan leaders



The investigation is focusing on National Assembly president Diosdado Cabello and other high-ranking Venezuelan officials. | **Ariana Cubillos** - AP FILE

BY JAY WEAVER
*jweaver@MiamiHerald.com*

Federal authorities are taking aim at the second-most powerful Venezuelan government official in a widening U.S. investigation into allegations that he pocketed millions of dollars from drug profits while providing a safe haven for Colombian traffickers to ship loads of cocaine through the country to the United States.

The investigation, run by a special unit of Drug Enforcement Administration agents in Washington and prosecutors in Miami and New York, is focusing on National Assembly president Diosdado Cabello and other high-ranking Venezuelan officials. They are suspected of not only accepting cash bribes from Colombian drug lords in return for allowing them to use Venezuela as a trans-shipment base, but also of participating in cocaine-smuggling operations, according to U.S. law enforcement sources familiar with the probe.

Federal authorities say that Cabello and other officials in the Venezuelan government and military have turned the country into a "narcostate," a troubling trend that escalated over the past decade as the U.S. government exerted intense pressure on the epicenter of South America's drug trade, Colombia. U.S. authorities say cartel kingpins shifted the distribution network of Colombian-produced cocaine to their neighbor, Venezuela, with the assistance of pliable senior officials in the administration of the country's late president, Hugo Chávez.

Reports of the expanding investigation have been mainly reported in the Venezuelan news media, along with a recent reference to the probe in el Nuevo Herald. On Monday, the Wall Street Journal confirmed the federal investigation in a lengthy story published online.

DEA special agent Rusty Payne, based in Washington, declined to comment Tuesday. The U.S. attorney's office in Miami also declined.

Cabello, who essentially acts as the president of Venezuela's congress, has vehemently denied the drug-trafficking allegations — sparking a fiery confrontation with the news media in his country. He has sued nearly two-dozen journalists and executives from three Venezuelan news organizations for publishing stories about the allegations earlier this year and has also obtained a court order banning them from leaving the country.

"They accuse me of being a drug trafficker without a single piece of evidence and now I'm the bad guy," Cabello said in a recent appearance on state television. "I feel offended, and none of them even said they're sorry."

Miguel Enrique Otero, publisher of Venezuela's leading newspaper, El Nacional, struck back on Tuesday, saying he feels vindicated with the American news coverage confirming the U.S. investigation linking senior Venezuelan officials to drug traffickers.

"It's a big fight because we are trying to defend democracy, freedom of speech," Otero said in a radio interview Tuesday in Miami with WLRN, the Herald's news partner. "And we don't have many weapons to fight against the absolute power that these people have."

Hints of the widening probe surfaced almost a year ago when U.S. authorities sought to arrest former Venezuelan military intelligence chief, Hugo Carvajal Barrios, in Aruba. Carvajal, suspected of collaborating with Colombian drug traffickers, was detained in Aruba last July but was not turned over to DEA agents for prosecution in Miami and New York after Venezuelan officials pressured the tiny Caribbean island to release him. U.S. investigators, who strategically must rely on targeted Venezuelan officials to leave the country to catch them, expressed outrage over Carvajal's return to Venezuela.

Traditionally, Venezuelan officials, including Chávez and his successor as president, Nicolás Maduro, have strongly denied the U.S. allegations of the government's involvement in drug-trafficking as nothing more than a concerted effort to malign the South American country.

According to the Wall Street Journal, U.S. authorities have built the case against Cabello and other Venezuelan officials with the assistance of convicted cocaine traffickers in Miami and New York, informants who were once close to those top officials and defectors from the Venezuelan military. As they seek to reduce their sentences, they historically have turned over insider information of payoffs to Venezuelan government and military leaders, including compensation in the form of cash bribes and direct roles in drug deals.

Among them: Cabello's onetime bodyguard, Venezuelan naval captain Leamsy Salazar. In January, Salazar defected and met in Washington with agents in the DEA's Special Operations Division, which coordinates major drug-trafficking investigations in hot spots around the world. According to the Journal, Salazar disclosed that he headed Cabello's security detail and witnessed him supervising the launch of a large shipment of cocaine in Venezuela.

Cabello, in turn, has attacked the messenger, saying Salazar was not his security chief. He called him an "infiltrator" with no proof of his involvement in drug trafficking, according to the Journal.

Cabello, 52, is a former army lieutenant who became close to Chávez when they were in the military academy and played on the same baseball team, the Journal reported. When Chávez launched an unsuccessful coup in 1992, Cabello led the assault on the presidential palace in downtown Caracas. He still exerts tremendous influence over the military.

Cabello has also been minister of public works and housing, which gave him control of the airports and ports, as well as minister of the interior and vice president.

The Journal, citing anonymous sources familiar with the U.S. probe, reported that among other Venezuelan officials suspected of drug trafficking are: Tarek El Aissami, a former interior minister and current governor of Venezuela's Aragua state; Nestor Reverol, the head of the National Guard; Jose David Cabello, the National Assembly president's brother, who heads the country's tax collection agency; and Luis Motta Dominguez, a National Guard general in charge of central Venezuela.

Carvajal, Venezuela's former military intelligence director, was accused in an indictment unveiled last year of assisting Colombian kingpins by allowing them to export multi-kilo shipments of cocaine by plane or boat from Venezuela through the Caribbean and Mexico to the United States. Carvajal was also accused of protecting traffickers from being captured and providing them with information about Venezuelan military and police investigations.

In return, Colombian kingpin Wilber Varela paid bribes to Carvajal and other high-ranking military and law enforcement officials, according to the indictment.

In addition, at the time of Carvajal's temporary detention in Aruba, a former Venezuelan judge was arrested at Miami International Airport in connection with the U.S. investigation.

Benny Palmeri-Bacchi was charged in a drug-trafficking case that for the first time linked former officials in Chávez's administration to Colombian cartel bosses. Palmeri-Bacchi pleaded guilty last year in Miami federal court to accepting bribes in return for providing protection for a Colombian trafficker in Varela's organization, Jaime Alberto Marin-Zamora. He was later extradited to Miami and pleaded guilty in 2011.

The one-time judge was in the middle of a long-secret investigation that also targeted former Venezuelan Interpol director, Rodolfo McTurk. Like Carvajal, McTurk is still in Venezuela and wanted on money laundering and drug trafficking charges in Miami.

*WLRN staff reporter Tim Padgett contributed to this story.*

## RELATED CONTENT

· Two families sue Venezuelan company after February plane crash

· In data dark Venezuela, facts are in short supply

· Venezuelan governor: Amazonas being 'invaded' by Colombian guerrillas

**MORE VENEZUELA**

Nosotros   Política y Privacidad
INICIO   NOTICIAS   HERRAMIENTAS ⌄   ORGANIZACIÓN   CURSOS Y ADIESTRAMIENTO ⌄   f  🐦 G+ in  Newsletter
CONTACTO



**Antilavado de Dinero**

INICIO   NOTICIAS   HERRAMIENTAS ·⌄   ORGANIZACIÓN   CURSOS Y ADIESTRAMIENTO ⌄   CONTACTO   Buscar...

Home › Casos

# Detienen en España a Hugo "El Pollo" Carvajal ex jefe de inteligencia de Hugo Chávez



**189** **1.5k**
SHARES VIEWS   f Share on Facebook        🐦 Share on Twitter        ↱

Autoridades españolas detuvieron este viernes 12 de abril al mayor general, Hugo "El Pollo" Carvajal a petición de Estados Unidos.

La Justicia de EE. UU. ha estado detrás de **Hugo Carvajal**, general que durante gran parte de la era de Chávez fue jefe de la inteligencia militar, desde hace varios años. Lo acusa de hacer parte del negocio del narcotráfico en el país. En 2014 intentó extraditarlo, luego de que Carvajal fuera detenido en Aruba, lo acusaba de tener negocios de narcotráfico con la guerrilla de las Farc.

## Related articles



Según la ONU Venezuela colapsó antes de que EE.UU. impusiera las
sanciones     es para asegurar que damos la mejor experiencia al usuario en nuestra web. Si sigues utilizando este sitio asumiremos que estás de acuerdo.
⊘ 14 ABRIL, 2019        ACEPTAR      POLÍTICA DE PRIVACIDAD

 **El paramilitarismo y la delincuencia organizada en América Latina**
🕓 14 ABRIL, 2019

Entonces, el Tribunal Supremo de Venezuela condenó su detención y pidió que lo dejaran libre pues tenía inmunidad "al ser funcionario consular activo venezolano".

> *Maduro calificó la detención del exdirector de inteligencia como una "emboscada" y, además de descartar que tenga o haya tenido cualquier relación con el narcotráfico, reiteró que se trata de un "diplomático en funciones del Estado venezolano".*

De acuerdo con Petit Carvajal estaba intentando llegar a un acuerdo de cooperación con EE. UU. pero no se ha logrado nada hasta ahora. Atribuyen esta declaración a un hijo de Carvajal que vive en España.

Esta periodista investigativa, también reveló en su cuenta los detalles de los casos contra Carvajal en EE. UU.

De ser trasladado a Estados Unidos y declarado culpable del delito de "conspiración para distribuir cocaína con conocimiento en Estados Unidos", el exmilitar venezolano, dice la prensa venezolana, podría llegar a ser condenado a cadena perpetua.

Desde hace un tiempo Carvajal comenzó a criticar al gobierno de Nicolás Maduro. Señala que nada pasa en el país sin que el presidente venezolano lo sepa. Culpó al gobierno chavista de los apagones y de la situación del país.

**Hugo Carvajal@hugocarvajal4f**

Padrino debería ponerse de par de b... y detener a Maduro. Fue quién ordenó la instalación de este sistema de torturas en la dgcim y el ingreso de los malditos cubanos a sus instalaciones. Ahí no se hace nada que Nicolás no apruebe.

El 21 de marzo de este año fue más allá. Hugo "El pollo" Carvajal, como se llama al ex director de Inteligencia y Contrainteligencia Militar en Venezuela, le pidió al ministro de Defensa del régimen, Vladimir Padrino López para que frene la brutalidad de Nicolás Maduro, luego de que se conociera el arresto de Roberto Marrero, jefe de Despacho del autoproclamado presidente interino de Venezuela, Juan Guaidó.

"La mayoría de la FAN quiere devolver la libertad a Venezuela, pero están secuestrados por este sistema de tortura y terror. Cuando dije que el control es más férreo de lo que imaginan, era en serio. Créanme, si no acabamos con los cubanos, la FAN no podrá cumplir con sus deberes", alertó en su cuenta de Twitter.

El 21 de febrero, Carvajal se convirtió en el primer militar de peso en reconocer a Guaidó. Entonces, grabó un mensaje y llamó a los militares a romper con el mandatario Nicolás Maduro: "Presidente encargado de Venezuela, Juan Guaidó Márquez, aquí está un soldado más por las causas de

Utilizamos cookies para asegurar que damos la mejor experiencia al usuario en nuestro sitio web. Si continúa utilizando este sitio asumiremos que estás de acuerdo.

ACEPTAR    POLÍTICA DE PRIVACIDAD

restablecer el orden constitucional que nos permita convocar elecciones libres".

Carvajal se había trasladado clandestinamente a Madrid, donde reside su hijo, y estaba negociando con el Departamento de Justicia un acuerdo de protección sin carcel a cambio de cooperar ampliamente con la justicia americana, escribió el periodista Casto Ocando en su cuenta de Twitter.

ALD/ElEspectador

Share 76          Tweet 47          ↰

**Entrada Anterior**

Fiscal del condado de Delaware acusado de fraude bancario y robo de identidad agravado

**Siguiente Entrada**

General Electric pagará multa de $ 1.500 millones por declaraciones falsas con préstamos y valores de hipotecas

## Related Posts



### Según la ONU Venezuela colapsó antes de que EE.UU, impusiera las sanciones

POR OPERADORANTILAVADO2   ⏱ 14 ABRIL, 2019   ⬚0

El secretario general de las Naciones Unidas, António Guterres, había guardado hasta ahora un vergonzoso silencio sobre la crisis humanitaria...

### El paramilitarismo y la delincuencia organizada en América Latina

POR OPERADORANTILAVADO2   ⏱ 14 ABRIL, 2019   ⬚0

El concepto de paramilitarismo en América Latina observa diferencias conceptuales en sus actores y ejecutores, dependiendo del país y en...

### Cómo las naciones pueden superar la corrupción

POR OPERADORANTILAVADO2   ⏱ 14 ABRIL, 2019   ⬚0

La leyenda política que construyó el Singapur moderno sobre cómo las naciones pueden superar la corrupción para darles a sus...

Utilizamos cookies para asegurar que damos la mejor experiencia al usuario en nuestra web. Si sigues utilizando este sitio asumiremos que estás de acuerdo.

ACEPTAR          POLÍTICA DE PRIVACIDAD

ALD Against Money Laudering

**Hugo "El Pollo" Carvajal, ex director of itelligence for Hugo Chavez is detained in Spain**

Spanish authorities detained this Friday april 12th the Major General Hugo "El Pollo" Carvajal at the United States request.

The authorities in the U.S.A. have been after Hugo Carvajal, a general that during the Chavez era was the chief of the military intelligence. He has been accused of of being part of the drug trafficking business in the country. In 2014 they tried to extradite him, after he was detained in Aruba, he was accused of having drugh trafficking businesses with the FARC Guerrilla.

At that time the Supreme Court in Venezuela condemned his detention and asked to have him released since he had inmunity for being an active Venezuelan consular official.

Maduro called the detention of the ex director of intelligence as an "ambush" and, while denying that he could have had any relationship with the drug business, he assured that he is a "Diplomat working for the Venezuela State".

According to Petit Carvajal he has been trying to come to a cooperation deal with the U.S.A. but nothing has been agreed on yet. This was said by Carvajal's son that lives in Spain.

This investigative journalist also revealed on her account the details of the cases against Carvajal in the U.S.A.

If he is moved to the United States and found guilty of the "Conspiracy to distribute cocaine with his knowledge in the United States", the ex military officer, says the Venezuelan papers, could be sentenced to life in prison.

A while ago, Carvajal started to critic Maduro's Government. He claims that nothing happens in Venezuela without Maduro's knowledge. He blamed the chavista government of the blackouts and the country situation.

**Hugo Carvajal@hugocarvajal4f**

Godfather, you should get some b.... and stop Maduro. He was the one that implemented the torture system at the DGCIM and the arrival of the damn Cubans to its premises. Nothing happens there without Maduro's approval.

On March 21st of this year (2019) he went even further. Hugo "El Pollo" Carvajal, as the ex director of the military intelligence in Venezuela, asked the Secretary of Defense of the regime, Vladimir Padrino Lopez to stop Nicolas Maduro's brutality after the arrest of Roberto Marrero the chief of staff of the self proclaimed

president interin of Venezuela Juan Guaido, was announced.

"Majority of the FAN (Armed Forces) want to return the freedom to Venezuela, but they are kidnapped by this torture and terror based system. Believe me, if we don't put an end to the Cubans, the FAN will not be able to fulfill their duty" he warned in his twitter account.

February 21st, Carvajal became the first heavy military in recognize Guaido. Then, he recorded a message and called on all the military to break with Nicolas Maduros's mandate: "President in charge of Venezuela, Juan Guaido Marquez, here is one more soldier standing for the freedom and democracy. to be used in the accomplishment of the task of re-instating the constitutional order that will allow us to have free elections again".

Carvajal had moved clandestined to Madrid, where his son lives, and he was negotiating with the Department of Justice a deal of protection without prison in exchange for full cooperation with the American justice. wrote the journalist Castro Ocando en su cuenta de Twitter.



# NOTICIAS VENEZUELA

Las noticias de Venezuela y el Mundo



**28 ABRIL, 2019 POR EDITOR**

## Revelan que el «Pollo Carvajal» tiene su lista de todos los militares narcotraficantes

Este sitio web utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

plugin cookies

ACEPTAR

▷ ✕

Watch Live Now

Watch Live Coverage!



**Las revelaciones de una ex jueza venezolana sobre el general Hugo Carvajal: «Tiene el listado de todos los militares narcotraficantes». Fue detenido en España y EEUU lo acusa, entre otros crímenes, de haber lavado dinero de la droga y de hacer negocios con el capo narcotraficante colombiano Wilber Varela. Hay una vieja rencilla entre la DEA y el ex oficial chavista desde que en 2005, cuando Hugo Chávez gozaba de vitalidad y un poder pleno, «El Pollo» les**

Este sitio web utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

plugin cookies

ACEPTAR

**dio 24 horas para dejar el país a varios miembros de esta agencia estadounidense tras declararlos personas no gratas.**

Más allá del pedido de extradición por parte de Washington al ex jefe de los servicios de contrainteligencia militar venezolano Hugo «El Pollo» Carvajal, detenido en España a causa de un delito relacionado con el narcotráfico en EEUU, hay una vieja rencilla entre la DEA y el ex oficial chavista desde que en 2005, cuando Hugo Chávez gozaba de vitalidad y un poder pleno, «El Pollo» les dio 24 horas para dejar el país a varios miembros de esta agencia estadounidense tras declararlos personas no gratas.

La espina había quedado clavada y los agentes esperaron su momento de venganza. «La DEA tampoco olvida que Carvajal ordenó matar a uno de sus hombres encubiertos en Venezuela«, revela Mildred Camero, quien fue la principal juez de la Comisión Nacional Contra el Uso Ilícito de las Drogas de Venezuela (Conacuid).

El pasado 13 de abril un juez español dictó la prisión provisional para Carvajal. Según fuentes de la Audiencia Nacional española, el ex general Carvajal negó ante el juez tener vínculos con el narcotráfico y las FARC colombianas, y además rechazó su entrega.

EEUU acusa a Carvajal de haber lavado dinero de la droga junto a Pedro Luis Martín Olivares, un antiguo cargo del Servicio Bolivariano de Inteligencia que el Tesoro estadounidense incluyó el pasado año en su «lista negra» de narcotraficantes.

Camero asegura que Carvajal «es muy astuto y meticuloso».  Tras una exitosa carrera de más de 30 años, la magistrada fue relevada de su cargo en el 2005, justo cuando se encontraba en Estados Unidos en una reunión regional de la DEA y con expertos en la lucha contra el narcotráfico, reveló el diario español *El Confidencial.*

Este sitio web utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

plugin cookies

ACEPTAR



El "Pollo" Carvajal junto al dictador Nicolás Maduro. (Reuters)

«Yo rendía cuentas personalmente al presidente Chávez porque fungía como ministra de Estado. Unas fechas antes de viajar a Florida, le entregué unos informes sobre las actividades criminales de 'El Pollo' Carvajal y otros generales, pero cuando llegué al aeropuerto ya me habían quitado el chófer, me allanaron la casa y hasta iniciaron una causa contra mí por traición a la patria», recuerda la jueza, quien, entre 2000 y 2002, fue presidenta de la Comisión Antidroga de la Organización de Estados Americanos (OEA).

**«'El Pollo' manejaba toda la Inteligencia del país, tanto la civil como la militar. Conoce todas las rutas por donde pasa la droga para acabar en Europa y Estados Unidos, sabe dónde están los laboratorios, tiene el listado de todos los militares narcotraficantes, lo sabe todo sobre las aproximadamente entre 240.000 y 300.000 toneladas de droga que transitan al año por territorio venezolano»**, dice.

La detención de Carvajal llegó después del viaje a España del enviado especial de

Este sitio utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

ACEPTAR

plugin cookies

Estados Unidos para Venezuela, Elliot Abrams, uno de los cerebros de la estrategia de Washington para derrocar al dictador Nicolás Maduro.



PERMANENT PRICE REDUCTION ▷ ✕

was $8,499

## now $7,999

on the Human Touch®
Novo XT2™

human touch

VISIT OUR STORE     👁 RELAX THE BACK®

Carvajal está acusado de hacer negocios con el capo narcotraficante colombiano Wilber Varela, fallecido en 2008, según documentos judiciales a los que tuvo acceso la agencia EFE. Un artículo de la revista Semana explicó que, en concreto, Carvajal fue acusado el 16 de mayo de 2013 por un gran jurado de Florida de haber recibido dinero de Varela, alias «Jabón», cabecilla de una facción del escindido cártel del Norte del Valle, para «asistir» al narcotraficante en sus «operaciones de tráfico de drogas».

Según Camero, Carvajal dio la orden para detener a dos militares colombianos que estaban encubiertos en Venezuela. Estos fueron llevados a los calabozos de Sebin en donde fueron torturados y asesinados.

Este sitio web utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

ACEPTAR

plugin cookies



Hugo Carvajal (EFE)

«Por esa acción existe una causa judicial abierta contra él en Colombia», afirma.

La Justicia estadounidense lo vincula con una facción del cártel colombiano del Norte del Valle, escindido por rivalidades internas, de la que Varela era cabecilla. En el documento de la acusación se relata que en 2004 Varela reubicó su base de operaciones delictivas en Venezuela por el temor a ser apresado por las autoridades colombianas y las amenazas de otros narcotraficantes.

«Desde 2004 hasta enero de 2008, Varela y sus compinches enviaron miles de kilos de cocaína de Venezuela a países como México, con conocimiento de que esa cocaína acabaría en territorio estadounidense», marcan los documentos donde se lo acusa.

Fuente;infobae.com

Seguir leyendo en el medio que originalmente publicó esta noticia

Este sitio web utiliza cookies para que usted tenga la mejor experiencia de usuario. Si continúa navegando está dando su consentimiento para la aceptación de las mencionadas cookies y la aceptación de nuestra política de cookies, pinche el enlace para mayor información.

plugin cookies



**VENEZUELA NEWS**
News of Venezuela and the World

APRIL 28, 2019
by the editor

THEY INFORM THAT "POLLO CARVAJAL" HAS A LIST OF ALL THE MILITARY DRUG TRAFFICKERS
The revelations of a former Venezuelan Judge about General Hugo Carvajal: "He has a list of all the military drug traffickers". He was detained in Spain and U.S. accuses him, among other crimes, of money laundering from drug procceds and doing business with the kingpin drug trafficker colombian Wilber Varela. There is old bad feelings between the DEA and the chavista ex-official, since in 2005, when Hugo Chavez enjoyed vitality and full power, "El Pollo" gave several members of this agency 24 hours to leave the country after declaring them persona non-grata.

Above and beyond the petition for extradition from Washington of the ex-chief of the venezuelan military counter-intelligence services former chief Hugo "El Pollo" Carvajal, detained in Spain due to a crime related with drug trafficking in the U.S. there is and old fight between the DEA and the chavista ex-official ever since 2005, when Hugo Chavez enjoyed vitality and power, "EL POLLO" gave several member of this agency 24 hours to leave the country and declared them persona non-grata.

The thorn was still stuck, and the agents awaited for their time to avenge. "The DEA also doesn't forget that Carvajal ordered the death of one of their undercover agents", reveals Mildred Camero, who was the main judge of the National Commission Against the Illegal Use of Drugs in Venezuela (Conacuid).

This past April 13th a Spanish judge ordered provisional prison for Carvajal. According to sources from the Spanish National Audience, the ex-general Carvajal denied before the judge having any ties with the drug traffickers and the Colombian FARC, and also denied his surrendering.

U.S. accuses Carvajal of money laudering from durg proceeds along with Pedro Luis Martin Olivares, an old chief in charge of the Bolivaria Service of Intelligence that the United States treasure included in the "black list" of drug traffickers.

Camero assures that Carvajal "is quite meticulous and astute". After a succesfull career of over 30 years, the Magistrate was renoved from her position in 2005, just when she was in the United States in a regional meeting with the DEA and with experts with the fight against drug trafficking, revealed the Spanish newspaper El Confidencial.

"I debriefed personally to president Chavez because I served as Secretary of State. Days before I traveled to Florida, I gave him some reports about the criminal activities of "El Pollo" Carvajal and other generals, but when I arrived at the airport they had

already taken my driver, they raided my house and they even filed charges against me for treason, remembers the judge, who, between 2000 and 2002, was the president of the Anti-drugs commission of the Organization of American States (OAS).

"El Pollo" controled all of the country's intelligence, civil as well as military. Knows all the routes where the drugs go through to end later in Europe and the United States, knows where the laboratories are, has a list of all the military drug traffickers, he knows all about the aproximately 240,000 and 300,000 tons of drugs that go through the venezuelan territory a year.

Carvajal's detention comes after special representative of the United States in venezuela traveled to Spain. Elliot Abrams, one of the ideologists of the strategy from Washington to bring down dictator Nicolas Maduro. Carvajal is accused of doing business with the colombian drug kingpin Wilber Varela, deceased in 2008, acording to judicial documents that the agency EFE had access to. An article from the magazine Semana explained that, in short, carvajal was accused May 16th, 2013 by a grand jury in the State of Florida of receiving money from Varela, a.k.a. "Jabon", head of a part of the cartel of the North of the Valley, to "assist" the drug trafficker with his "operations of drug trafficking".

According to Camero, Carvajal gave the order to detain two colombian military members that were undercover in Venezuela. These were taken to the holding facility of Sebin, where they were tortured and murdered.

<u>**APPENDIX B**</u>

<u>**CONTENT**</u>:

\* Resentencing Transcripts - Juan Carlos Sanchez

\* Rodolfo McTurk/Benny Palmeri's Federal Indictment

\* Declaration from DEA Special Agent J. Brian Whitworth

1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2

               CASE NO. 12-60088-CR-ZLOCH
3

UNITED STATES OF AMERICA,
4                           Fort Lauderdale, Florida
            Plaintiff(s),
5                        June 15, 2018
       vs.
6

JUAN CARLOS SANCHEZ,
7

           Defendant(s).
8  ---------------------------------------------------------

9               MOTION TO REDUCE SENTENCE
         BEFORE THE HONORABLE WILLIAM J. ZLOCH
10            UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  FOR THE PLAINTIFF(S):  Thomas P. Lanigan, Esquire
                       United States Attorney's Office
13                  500 East Broward Boulevard
                  Seventh Floor
14                  Fort Lauderdale, Florida 33394

15

16  FOR THE DEFENDANT(S):  Paul D. Petruzzi, Esquire
                       The Bank Building
17                  8101 Biscayne Boulevard
                  Penthouse 701
18                  Miami, Florida 33138

19

20

21  REPORTED BY:          Tammy Nestor, RMR, CRR
                       Official Court Reporter
22                  299 East Broward Boulevard
                  Fort Lauderdale, Florida 33301
23                  tammy_nestor@flsd.uscourts.gov

24

25

```
 1   Thereupon,

 2   the following proceedings began at 9:57 a.m.:

 3             THE COURT:  Good morning.  Please be seated.

 4             Calling case No. 12-60088-Criminal.  Counsel, would

 5   you note your appearances.

 6             MR. LANIGAN:  Good morning, Judge.  Thomas P. Lanigan

 7   on behalf of the United States.  With me at counsel table is

 8   DEA Special Agent Brian Whitworth.  With the Court's

 9   permission, he will be assisting me in this morning's hearing.

10             THE COURT:  Good morning.

11             MR. PETRUZZI:  Good morning, Your Honor.  Paul

12   Petruzzi on behalf of Juan Carlos Sanchez.  Mr. Sanchez is back

13   before the Court.

14             THE COURT:  Good morning, counsel.

15             Let the record reflect that Juan Carlos Sanchez is

16   present and in the courtroom.  Can I have the representative

17   from the probation office note her appearance?

18             THE PROBATION OFFICER:  Good morning, Your Honor.

19   Shannon Culberson on behalf of the probation office.

20             THE COURT:  Good morning.

21             We are here pursuant to the government's motion for

22   reduction of sentence, docket entry No. 545 in the court file.

23   Let me hear from the government, and then I'll hear from the

24   defense.

25             MR. LANIGAN:  Thank you, Judge.  First off, I would
```

```
 1   like to thank the Court for setting the hearing so promptly.

 2   This is an unusual situation in that the cooperation -- I was

 3   not involved in the cooperation.  The cooperation was primarily

 4   with Assistant United States Attorney Richard Gregorie who is

 5   here today.  With the Court's permission, I think it would be

 6   quicker if I were to call him as a witnesses and he would

 7   basically advise the Court of what the cooperation was.  This

 8   is his first time testifying as a civilian, Your Honor.

 9            THE COURT:  Or he can just step up to the podium and

10   tell the Court.

11            MR. LANIGAN:  Okay, Your Honor.  That would be fine.

12            MR. PETRUZZI:  No objection, sir.

13            THE COURT:  Fine.

14            Good morning.

15            THE WITNESS:  Good morning, Judge.

16            THE COURT:  Just state your full legal name for the

17   record.

18            THE WITNESS:  Richard Gregorie.

19            THE COURT:  Would you spell your last name for the

20   reporter.

21            THE WITNESS:  G-R-E-G-O-R-I-E.

22            THE COURT:  Good morning, sir.  Go right ahead.

23            THE WITNESS:  Thank you, Judge.  Judge, a number of

24   years ago, Mr. Petruzzi, the attorney for the defendant, called

25   me and said his client possibly had significant information
```

```
 1    that could help the government in a case against a judge in
 2    Venezuela.  The government then brought Mr. Sanchez down to the
 3    federal prison in Miami, and we spent several days interviewing
 4    him.  His information was very, very helpful and resulted in
 5    the indictment of a major Venezuelan defendant who himself
 6    ended up being a major witness against a number of very high
 7    level Venezuelan officials.
 8            As a result of speaking with the defendant, he also
 9    turned over to us some tape recordings in which there were
10    video and audio recordings of the torture of an individual in
11    prison in Venezuela.  And the defendant was told if he didn't
12    cooperate with the Venezuelans, then he was going to end up
13    like this individual.  So it was clear his physical well-being
14    was in danger.
15            As a result of this, Your Honor, we indicted the case.
16    The Venezuelan judge came into Miami on his way to Disney
17    World.  We arrested him, convicted him, and he, himself, has
18    turned into a major cooperator with the U.S. government.  As a
19    result, it was my recommendation to Mr. Lanigan that this
20    defendant deserve credit for his cooperation.
21            THE COURT:  Well, thank you very much.  Any questions
22    of Mr. Gregorie, Mr. Petruzzi?
23            MR. PETRUZZI:  I don't have any questions, Your Honor.
24    I wanted to add some specificity as to, not the actual identity
25    of the individuals that wound up being charged and in one case
```

```
1    arrested, one or two cases arrested, so that Your Honor can
2    understand how significant they were.  I already know the facts
3    of the case, but I don't think we need Mr. Gregorie for it.
4              THE COURT:  All right.  Fine.
5              MR. LANIGAN:  Your Honor, a couple quick questions of
6    my witness.
7              THE COURT:  Yes.
8              MR. LANIGAN:  Mr. Gregorie, Mr. Sanchez, was he
9    laundering money for Benny Palmeri back in 2007?
10             THE WITNESS:  Yes, I believe that's approximately when
11   all of this began, and there was no question that Mr. Sanchez
12   was laundering funds on behalf of Benny Palmeri.
13             MR. LANIGAN:  In fact, he sold Mr. Palmeri a condo up
14   in Orlando at a place called Studio Park?
15             THE WITNESS:  I believe that's true, and I think we
16   received that or attempted to forfeit it.
17             MR. LANIGAN:  So the Court is clear, early on
18   Mr. Sanchez knowingly and willingly entered this organization
19   in Venezuela, is that correct?
20             THE WITNESS:  To my knowledge, yes.  However, as I
21   say, at one point he was threatened in order to make sure that
22   he continued to provide them assistance.
23             MR. LANIGAN:  Correct.  But just so the Court's clear,
24   these people basically turned on him at some point, and that's
25   when he began to cooperate?
```

```
 1              THE WITNESS:  That's correct.

 2              MR. LANIGAN:  Okay.

 3              MR. PETRUZZI:  And, I'm sorry, Your Honor, I guess now

 4   I'm going to have some questions.

 5              THE COURT:  Sure.

 6              MR. PETRUZZI:  If that's okay with the Court.

 7              THE COURT:  Yes.

 8              MR. PETRUZZI:  Thank you.

 9              Mr. Gregorie, thank you again.  Mr. Sanchez was always

10   completely honest and a hundred percent forthright with you?

11              THE WITNESS:  Oh, absolutely.  He was forthcoming and,

12   in fact, he volunteered a lot of information and was of very

13   great assistance to the agent.

14              MR. PETRUZZI:  Would you have been able to get that

15   information, those emails, or anything else otherwise?

16              THE WITNESS:  No.  There was no way to get it without

17   him.

18              MR. PETRUZZI:  And so this individual, the Venezuelan

19   Judge, that's Mr. Palmeri, he was indicted with another

20   individual named Mr. McTurk.

21              THE WITNESS:  Mr. McTurk is still a fugitive.  He was

22   the Interpol representative in Venezuela, and he's still in

23   Venezuela as we speak.

24              MR. PETRUZZI:  And as the Interpol -- the chief

25   Interpol officer in the country of Venezuela, he misused his
```

1    position to assist drug traffickers.

2         THE WITNESS:  Absolutely.

3         MR. PETRUZZI:  And again, it was Mr. Sanchez who

4    started the ball rolling with that through Mr. Palmeri?

5         THE WITNESS:  Well, we had already identified

6    Mr. McTurk as a major target, but having the information

7    provided by Mr. Sanchez helped us with the indictment.

8         MR. PETRUZZI:  And some of the other high level

9    officials in Venezuela who were part of this massive drug

10   trafficking organization included, I believe, the director of

11   national security?

12        THE WITNESS:  That's correct.

13        MR. PETRUZZI:  And the vice president.

14        THE WITNESS:  Well, I'm not sure that Mr. Sanchez's

15   information would go quite that far, but certainly it assisted

16   us in the investigation of the vice president.

17        MR. PETRUZZI:  And can you name the positions held by

18   some of the other individuals who are targets?

19        THE WITNESS:  At this point, Judge, because some of

20   them are not under indictment, I think it's improper for me to

21   be putting that in public information.  I would rather not do

22   that.

23        MR. PETRUZZI:  Fair enough.  But suffice it to say

24   that they are very high level government officials?

25        THE WITNESS:  Yes, very high level.

```
 1          MR. PETRUZZI:  And with respect to Mr. Sanchez being

 2   victimized by Mr. Palmeri, did that happen, in other words,

 3   these threats that he could wind up murdered, did that happen

 4   before or after the purchase of the condominium?

 5          THE WITNESS:  That, I'm not sure of.  I'm not sure I

 6   know that.  I know it was during the process of the time that

 7   he was helping Mr. Palmeri.  I don't remember the facts well

 8   enough right now to be able to tell you exactly what it was.

 9          MR. PETRUZZI:  Fair enough.  And so that threat was

10   made to Mr. Sanchez in order to induce his cooperation with

11   their money laundering activities?

12          THE WITNESS:  That's correct.

13          MR. PETRUZZI:  Okay.  Thank you.  Nothing further.

14   Thank you, Your Honor.

15          THE COURT:  Mr. Lanigan, any further questions?

16          MR. LANIGAN:  No, Your Honor, not of this witness.

17          THE COURT:  Thank you, Mr. Gregorie.

18          THE WITNESS:  Thank you, Judge.

19          MR. LANIGAN:  May I continue, Your Honor?

20          THE COURT:  Yes, sir.

21          MR. LANIGAN:  Your Honor, I would like to approach.  I

22   have already provided a copy of this to counsel.  This is the

23   prison file on Juan Carlos Sanchez.  I'll have that marked as

24   Government's Exhibit 1.  I have the case number on there.

25          Now, Your Honor, I'm authorized to ask for a third off
```

```
 1   on this case.  And I know this Court remembers this case.  We

 2   sat through a 23-day trial and excruciating detail.  I detailed

 3   the financial chaos that was occurring at Marina Oaks that

 4   allowed a lot of people to profit and make a lot of money.  We

 5   have a loss of over $35 million.  Mr. Sanchez is responsible

 6   for restitution in the area of 33 million.  I think he's paid a

 7   couple hundred dollars to date.

 8        Your Honor, drawing your attention to Government's

 9   Exhibit 1, his estimated release date, were the Court to do

10   nothing, would be 2025, May 2025.  Now, the Court gave him a

11   break early on.  The original guideline sentence was 188 to 235

12   months.

13        And I have a copy of the sentencing transcript here,

14   but I don't think Mr. Petruzzi is going to dispute me on that.

15   The Court gave him a break up front and gave him 180 months,

16   not only the low end of the guidelines, but the Court departed

17   downward.

18        He then went on to serve his sentence.  Mr. Petruzzi

19   contacted Mr. Gregorie and set all this in motion.

20        I did not use him in the Marina Oaks trial.  He was

21   the leader.  He was the organizer.  Kind of a fluke, though, he

22   didn't make the most money.  It looks like from the records

23   that Quelyory Rigal made the most money.  He was the guy that

24   liked to be the big shot, liked to be in charge of everything.

25   These were his developments.  These were his companies.  Home
```

1    First Realty was used on almost every transaction to receive

2    the incentive which is what drove these people to buy these

3    condos at inflated prices that they normally wouldn't purchase.

4          But, Your Honor, this is a very serious case.  It's a

5    very serious case for our office and for the community at

6    large.  That area where Marina Oaks was was a very viable, nice

7    area.  And after this happened, these condos that were going

8    for 289 for a two bedroom, 210 for a one bedroom, these things

9    ended up selling for 35,000, 40,000 dollars.  People's credits

10   were ruined.  You recall some of the court testimony that

11   people were buying five, six of them.  It was craziness going

12   on there.

13         That area depreciated so badly, a lot of these units

14   were vacant.  There were drug and prostitution calls the

15   Fort Lauderdale Police Department responded to.

16         And clearly Home First Realty and Juan Carlos

17   Sanchez's organization was directly responsible for what

18   happened there.  They turned this place into basically an

19   abandoned enclave because everybody defaulted on their loans.

20         THE COURT:  What is the status of that property today?

21         MR. LANIGAN:  It's coming back slowly.  As the market

22   is going back up, a lot of investors have bought these units,

23   fixed them up, and it is coming back.  They are probably worth

24   about 110, 120 thousand per unit now.  So luckily it's coming

25   back, but it's been a long time coming back.

1          Your Honor, I just want the Court to be clear, I'm

2    here asking for a sentence reduction, but I really want the

3    Court to remember how serious this case was.  Now, this

4    defendant was involved with Benny Palmeri willingly back in the

5    day when he was laundering money for Benny Palmeri.

6          He didn't get drug into this organization over in

7    Venezuela.  He willingly -- then they turned on him.  Venezuela

8    a very dangerous country, as the Court is aware.  The rule of

9    law has pretty much been abandoned there.  It's a very

10   dangerous country.  I understand that.  But he willingly got

11   involved with these people, so I want the Court to keep that in

12   consideration.

13          Your Honor, this defendant is responsible for

14   $33 million in loss that we know of.  He's paid a couple

15   hundred dollars.  And, you know, I don't know where this money

16   went to.  I know Quely Rigal made money.  I know everybody made

17   money.  But the money is gone.

18          I really want the Court to consider the government's

19   request for to take a third off.  Now, a third off, I think, is

20   extremely generous.  Let's not lose sight of the fact that he

21   was a willing participant in the money laundering in Venezuela

22   and the corruption in Venezuela, and he never got charged with

23   that.  He gets credit for it today which is somewhat ironic.

24          I'm hoping that the Court will consider a third and no

25   more.  And a third, I think, is extremely generous.  I'm trying

```
 1    to balance the public policy that we want to reward people who

 2    cooperate, but at the same time, under 18 U.S.C., 3553(a)

 3    through (e) factors, we need to send a message that you can't

 4    go out and engage in an orgy of financial fraud, find some

 5    great information, come back to another part of the government,

 6    and say, hey, guys, I got this, I got that, let me out.  There

 7    has to be sanctions, there has to be culpability for his

 8    actions.

 9            So I'm asking the Court to limit the reduction to the

10    60 months that I'm authorized to ask for and that would keep

11    Mr. Sanchez in for a another two years.  A lot of people are

12    watching what happens to this case.  This is somewhat like the

13    poster boy of the fraud case that was happening here during the

14    mortgage blowup.  And a lot of people are looking at what

15    happens in this case, Your Honor.  It's important that the

16    appropriate sanctions are still kept on Mr. Sanchez.

17            I didn't call him in the case; although, I listed him

18    as a witness.

19            THE COURT:  I remember that.

20            MR. LANIGAN:  I listed him as a witness name that

21    would be called because we didn't want to pick a jury and be in

22    three weeks of trial, then all of a sudden have his name come

23    up and somebody says, oh, I know Juan Carlos Sanchez, he

24    coached my kids soccer or something like that.

25            I want to point this out to the Court.  If I may
```

1    approach, this is Government's Exhibit 3.  The way I style my

2    witness list, I put in there the names of witnesses or names

3    that will be frequently mentioned.  I never had any intention

4    to call Juan Carlos Sanchez; although, he was debriefed, I

5    would stipulate to that, and that's part of his acceptance

6    responsibility.

7              He gave us information on the case, and he got the

8    three-level acceptance of responsibility.  Not only that, this

9    Court gave him a break for him coming in early, for him

10   cooperating, accepting responsibility, and gave him below his

11   guideline level.  He should have been 188 months.  The Court

12   gave him 180 months.

13             THE COURT:  Let me ask you, because I did not look at

14   this before I came on the bench, but I thought that you said

15   earlier that you had a copy of the sentencing transcript?

16             MR. LANIGAN:  I do, Your Honor.

17             THE COURT:  Refresh my memory.  Why did I vary?  I

18   mean, did someone request a variance?

19             MR. LANIGAN:  No, Your Honor.  The Court just looked

20   at all the facts.

21             THE COURT:  Did the government talk to me at that time

22   about his cooperation even though you didn't call him?

23             MR. LANIGAN:  No.  I did say at some point, you know,

24   we might be coming back because he did know a lot about other

25   frauds and things like that.  And I did make a statement.  I

```
 1    said some day I hope to be coming back.  But I did not -- if I
 2    may have a moment, let me --
 3              THE COURT:  That's all right.  But in any event, no
 4    one made an ore tenus motion and no one filed a motion?
 5              MR. LANIGAN:  No, Your Honor.  There was no 5K1.
 6    There was no ore tenus motion or anything.
 7              THE COURT:  Okay.  That's fine.
 8              MR. LANIGAN:  Your Honor, this is a very serious case,
 9    and this is a case where I don't want to appear schizophrenic
10    where we are asking for a reduction and I'm telling you how bad
11    a guy he is.
12              THE COURT:  I understand.
13              MR. LANIGAN:  I'm hoping the Court can balance the two
14    things here.  This is a very serious case, and he did a lot of
15    bad things, but he did good things to help Mr. Gregorie.
16              If the Court doesn't have any other questions of
17    myself, I will sit down.
18              THE COURT:  That's fine.  Thank you.
19              MR. LANIGAN:  Thank you.
20              THE COURT:  Mr. Petruzzi.
21              MR. PETRUZZI:  Thank you, sir.  May I?  And first,
22    Your Honor, thank you to Mr. Lanigan for filing the motion.
23              Mr. Sanchez has been incarcerated now for over six
24    years on this matter.  I'm sure the Court remembers some of the
25    other folks that were involved and that were sentenced in this
```

1    case, some of them cooperators, some of them not.  But with the

2    exception of Ms. Rigal who went to trial, received no

3    acceptance of responsibility points, everyone else received

4    sentences of less than 70 months.  A 70-month sentence was

5    initially Ms. Campo.  And then there's Ms. Lazardi who received

6    21 months.  Montero, 22 months.  Mr. Mena, cooperated, received

7    54 months.  Ms. Mota, five years probation.  Mr. Arboleda, 30

8    months.

9            A couple things I wanted to point out, Your Honor.

10   And probably one of the best ways to do it is to go over

11   Mr. Lanigan's words from prior motions and from the sentencing

12   of Mr. Sanchez and Ms. Rigal.

13           First, at page 7 of the transcript of Mr. Sanchez's

14   sentencing, Mr. Lanigan advised the Court that Mr. Sanchez

15   accepted responsibility from the time that he was arrested.  We

16   have met with him on two occasions.

17           And this was back in, good grief, January of 2013.

18           We have met with him on two occasions.  We look

19   forward to meeting with him on a series of additional meetings

20   and I look forward coming into this court in the future and

21   hopefully asking the Court to consider a possible Rule 35 based

22   on his substantial assistance.

23           At this point, pursuant to the express terms of the

24   plea, I would request the Court consider the low end of the

25   applicable guideline range based on his acceptance of

1    responsibility.

2            And that plea agreement was not negotiated one bit.

3    It was plus four for leadership.  It was every conceivable

4    enhancement that was even marginally applicable.  And through

5    me, in March of 2013, there was a written stipulation of

6    restitution.  And I told Mr. Lanigan to pick the figure.  And

7    it was just that simple.  That was just before Ms. Rigal's

8    trial was going to start.

9            So obviously he and Mr. Sullivan, the IRS agent on the

10   case, were preparing for the trial.  Mr. Sanchez was writted.

11   A writ was issued.  He was brought back to Miami, kept at the

12   federal detention center.  He was listed as a witness.  I

13   understand Mr. Lanigan, for tactical reasons, chose not to call

14   him as a witness.  But later on, after Ms. Rigal's conviction

15   and the conviction being affirmed on appeal, she then filed a

16   motion for new trial.

17           And in her response, and this is at docket entry 504,

18   at page 3, Mr. Lanigan describes the conspirators, Ms. Rigal

19   and Mr. Sanchez.  And he says, Rigal alleges that Sanchez's

20   additional criminal activity was the driving -- meaning this

21   Venezuelan stuff that he was coerced into, by the way.  I do

22   quibble with that one small point that Mr. Lanigan made.

23   Mr. Sanchez did not engage in any monetary transactions with

24   Mr. Palmeri until after he was threatened.  And that's why he

25   was listed by initial in the indictment of Mr. Palmeri.

1    Mr. Palmeri was indicted in part for making these threats

2    against Mr. Sanchez.

3            But going back to what Mr. Lanigan said, Rigal alleges

4    that Sanchez's additional criminal activity was the driving

5    engine for his fraud scream in the instant case as well as the

6    source of his need to drive up the revenue for the criminal

7    scheme in this case in order to keep at bay his antagonists in

8    the criminal conspiracy in the Venezuelan matters.

9            This theory is debunked by the fact that Rigal made

10   more money than any other salesperson or mortgage broker in the

11   Maria Oaks fraud.  Rigal had obtained $8.8 million in

12   fraudulent mortgages for her various clients and had been paid

13   as both the real estate salesperson and mortgage originator on

14   dozens of transactions.  Rigal netted over $800,000 from the

15   conspirator.

16           If Sanchez really needed to drive up the revenue to

17   keep his Venezuelan antagonists at bay, why would he allow

18   Rigal to make more money than he did at Marina Oaks.

19           Sanchez was arrested without incident on April 30 --

20   it's actually April 20, I believe -- but on April 30, 2012

21   while living in a rundown apartment in the New York City area

22   with four other persons, a far cry from the international money

23   launder Rigal alleges him to be.

24           That was Mr. Lanigan.  And that's true.  Mr. Sanchez

25   did not make the lion's share of the money.  He was the wanna

1   be playboy with all these real estate agents that he was

2   tutoring, like Ms. Rigal.  He didn't make the Lion's share of

3   the money.

4           And Mr. Lanigan again mentioned that at Ms. Rigal's

5   sentencing where he advised Your Honor that, what's most

6   important and quite telling, this defendant, meaning Ms. Rigal,

7   received more money from this operation than Juan Carlos

8   Sanchez.  We thought that was a little strange why she would

9   receive more of the actual money and appeared that Juan Carlos

10  Sanchez more wanted to be the big shot and wanted to be the

11  guy.  These were his developments.  This was his company.  This

12  was his operation.  But he wasn't that money driven.

13          So it was Mr. Sanchez playing this South Florida

14  playboy-type role more than anything.

15          His cooperation with the government has been complete,

16  open, honest, and 110 percent from his arrest, from the day of

17  his arrest.  He turned over thousands of emails.  He turned

18  over paper records.  He turned over digital files, jpeg

19  photographs.  He turned over videos, everything that he had.

20  Between the disclosure of all of that stuff to Agent Sullivan

21  with the IRS on this case, there was his later disclosure to

22  all of the DEA agents on Mr. Gregorie's case that started the

23  dominoes falling in probably one of the biggest investigations

24  in the hemisphere that is going on now, period.  It is.

25          That Venezuelan investigation that Mr. Gregorie left

1    at the office is huge, and it's significant.  It's a corrupt

2    government.  It's a narco state.  It's Noriega and Panama times

3    a hundred.  That's what Venezuela became.  And Mr. Sanchez

4    played a role.  He played a role in turning over all of that

5    evidence to grab the Venezuelan judge.

6            Not only that, he provided the agents in that case

7    with the information about Judge Palmeri's likes and dislikes

8    so that they could lure him to the United States.  He helped

9    capture the guy.  The guy was actually afraid to come to the

10   United States initially until the right lure was made without

11   getting into the details.  It was Mr. Sanchez's idea to

12   actually grab the guy.

13           Now, I understand that Mr. Lanigan is up here in

14   Lauderdale, and he's got this view.  It's a very serious case.

15   It is.  The mortgage fraud case, lenders like IndyMac and

16   whatever these other shady California lenders were, that's what

17   was going on back then at that time.  It caused a lot of

18   damage.  It caused a lot of damage to the local community.

19           Mr. Sanchez has paid for that.  He's been in jail for

20   over six years.  He provided the information that assisted

21   Mr. Lanigan in getting Ms. Rigal's conviction and conviction of

22   some of the other folks that were here before Your Honor, the

23   folks made the money, that made the lion's share of the money.

24           Meanwhile, Mr. Gregorie's got his view from Miami, and

25   he's in the middle of this massive, and that's not an

```
 1    overstatement by any means, criminal drug enterprise that

 2    Mr. Sanchez's cooperation helped further in a very, very

 3    significant way, significant enough to drag Mr. Gregorie out of

 4    retirement to come here and say a couple of words on behalf of

 5    Mr. Sanchez.  I didn't subpoena him.  And we are very

 6    appreciative.  And Mr. Sanchez did his best to cooperate from

 7    day one with everything.

 8              It's up to Your Honor to determine the amount of the

 9    reduction.  Your Honor can use the 3553 factors.  Your Honor

10    has Mr. Sanchez's prison record before you.  There's not a

11    single incident.  It's nothing but year after year of taking

12    courses.  He was trusted to be the orderly.  And the last few

13    more than a year and then some, he's been at a U.S.

14    penitentiary.  Why?  Because the BOP is opening up a new U.S.

15    penitentiary, and they need to train the guards so they brought

16    in some of the worst inmates and some of the best inmates like

17    Mr. Sanchez who is the orderly to help get these guards used to

18    running a United States penitentiary.

19              So not only has he been doing time for the past many

20    months, he's been doing hard time at a USP when he would

21    otherwise be in a different type of facility.  He didn't waver

22    once with his cooperation.  If some day he's deported to

23    Venezuela, he will be threatened.  His life will be in danger.

24    We have evidence of that in the case.  And the government has

25    alleged that, and the grand jury indicted on that.
```

1           So he doesn't have a great road ahead of him, but I

2    know that what he wants more than anything is to get back to

3    his daughters.

4           Your Honor has the discretion to grant a reduction of

5    a hundred percent.  I'm not asking Your Honor to do that,

6    obviously.  But I am asking that Your Honor grant a reduction

7    greater than 30 percent because that's what this is worth.  I

8    think it's worth a 50 percent reduction, to be quite frank.

9    But that's what it's worth.  So I would ask that Your Honor do

10   that.  Thank you, Judge.

11          THE COURT:  All right.  Thank you.

12          Any reply?

13          MR. LANIGAN:  No, Your Honor.

14          THE COURT:  Mr. Lanigan, just so the record is clear,

15   the government is requesting a reduction of five years?

16          MR. LANIGAN:  Yes, Your Honor, that would be 60 months

17   off the original 180-month sentence which the Court gave him an

18   8-month break early on and the low end.

19          THE COURT:  All right.  The Court will grant the

20   government's motion for a reduction of sentence pursuant to

21   Federal Rule of Criminal Procedure 35, docket entry No. 545 in

22   the court file.  The Court finds that Mr. Sanchez has rendered

23   substantial assistance to the government.  The government

24   concedes that point.

25          Accordingly, Mr. Sanchez's sentence is hereby reduced

```
 1    to a term of 114 months as to Count~1 of the indictment

 2    followed by a term of supervised release of three years

 3    together with all standard and special conditions that were

 4    previously imposed, they are reimposed at this point in time,

 5    plus restitution in the amount that has been previously ordered

 6    by this Court.

 7              Does that cover everything, Madam Probation Officer?

 8              THE PROBATION OFFICER:  Yes, Your Honor.

 9              THE COURT:  All right.  There being no further

10    business, Mr. Sanchez, you are remanded to the custody of the

11    United States marshal.  This session of the court is adjourned.

12    Let me return these exhibits to the government.  Court is in

13    recess.

14              MR. LANIGAN:  Thank you, Judge.

15              MR. PETRUZZI:  Thank you, Your Honor.

16              (Thereupon, the hearing concluded at 10:39 a.m.)

17                          -  -  -

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an

accurate transcription of the proceedings in the

above—entitled matter.



7/23/18                    s/ Tammy Nestor
                           Tammy Nestor, RMR, CRR
                           Official Court Reporter
                           299 East Broward Boulevard
                           Fort Lauderdale, Florida 33301
                           tammy_nestor@flsd.uscourts.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-20930 CR-UNGARO

/TORRES

21 U.S.C. § 963
18 U.S.C. § 1956(h)
18 U.S.C. § 1512(k)
18 U.S.C. § 1951(a)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)
21 U.S.C. § 853



UNITED STATES OF AMERICA

vs.

**RODOLFO McTURK and**
**BENNY PALMERI-BACCHI,**

**Defendants.**

_____/

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

1.      Jaime Alberto Marin Zamora was a Colombian manager of a drug trafficking organization that distributed cocaine from Colombia to Venezuela to Mexico and the Caribbean for distribution in the United States.

2.      Between 2006 and September 2010, Jaime Alberto Marin Zamora did conduct his drug trafficking business from Venezuela and did distribute thousands of kilograms of cocaine knowing that the cocaine would be unlawfully imported into the United States.

3.      On February 12, 2009, a Federal Grand Jury in the Southern District of Florida did indict Jaime Alberto Marin Zamora for conspiracy to distribute cocaine with the knowledge that such cocaine would be unlawfully imported into the United States. The indictment was numbered

09-20140-CR-SEITZ.

4.      On February 12, 2009, the United States District Court for the Southern District of Florida did issue an arrest warrant for the arrest of Jaime Alberto Marin Zamora on the indictment in paragraph 3 above.

5.      Defendant RODOLFO McTURK was a Venezuelan officer in the Venezuelan Police Agency known as the C.I.C.P.C., Cuerpo de Investigaciones Cientificas, Penales y Criminalisticas and was the Director of the International Police Office, Interpol, for Venezuela.

6.      Defendant BENNY PALMERI-BACCHI was a Venezuelan attorney who served as a judge, prosecutor and attorney in the Venezuelan judicial system.

7.      J.C.S. was the owner and operator of a realty company and a real estate school. Both of these companies did business in interstate and foreign commerce.

## COUNT 1

8.      Paragraphs 1 through 7 of the Introduction section set forth above are re-alleged and incorporated in this count by reference as if fully set forth herein.

9.      Beginning in and around February 2009, the exact date being unknown to the Grand Jury, and continuing until in and around September 2010, in the country of Venezuela, South America and elsewhere, the defendants,

**RODOLFO McTURK and
BENNY PALMERI-BACCHI,**

did knowingly and willfully combine, conspire, confederate and agree with Jaime Alberto Marin Zamora and other persons known and unknown to the Grand Jury, to distribute a Schedule II controlled substance, knowing that such controlled substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a)(2); all in violation of

2

Title 21, United States Code, Section 963.

Pursuant to Title 21, United States Code, Section 960(b)(1)(B) it is further alleged that this violation involved five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, which is a Schedule II controlled substance.

## COUNT 2

10. Paragraphs 1 through 7 of the Introduction section set forth above are re-alleged and incorporated in this count by reference as if fully set forth herein.

11. Beginning in and around February 2009, and continuing through in and around September 2010, the exact dates being unknown to the Grand Jury, in the Country of Venezuela, South America, in Miami-Dade County in the Southern District of Florida, and elsewhere, the defendants,

**RODOLFO McTURK and
BENNY PALMERI-BACCHI,**

did knowingly and willfully combine, conspire, confederate and agree with Jaime Alberto Marin Zamora and with other persons known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1512(c)(2); that is, to corruptly obstruct, influence and impede an official proceeding, that is, the prosecution in the United States District Court for the Southern District of Florida, of Jaime Alberto Marin Zamora in criminal indictment number 09-20140-CR-SEITZ, by delaying and preventing the extradition and expulsion of Jaime Alberto Marin Zamora from Venezuela to the United States.

All in violation of Title 18, United States Code, Section 1512(k).

## COUNT 3

12. Paragraphs 1 through 7 of the Introduction section set forth above are re-alleged

3

and incorporated in this count by reference as if fully set forth herein.

13.     Beginning in and around February 2009, and continuing through in and around September 2010, the exact dates being unknown to the Grand Jury, in the country of Venezuela, South America, in Miami-Dade County in the Southern District of Florida, and elsewhere, the defendant,

**BENNY PALMERI-BACCHI,**

did knowingly and willfully combine, conspire, confederate and agree with other persons, both known and unknown to the Grand Jury, to commit certain offenses against the United States, in violation of Title 18, United States Code, Section 1956, that is:

a)     to knowingly conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b)     to knowingly conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c)     to transport, transmit and transfer monetary instruments and funds to a place in the United States from and through a place outside the United States, knowing that the funds involved

4

in the transportation, transmission and transfer represented proceeds of some form of unlawful activity and knowing that the transportation, transfer and transmission were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

It is further alleged that the specified unlawful activity is conspiracy to distribute cocaine, a Schedule II controlled substance, knowing that such substance will be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a)(2) and 963, and conspiracy to obstruct justice in violation of Title 18, United States Code, Section 1512(k).

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT 4

14.     Paragraphs 1 through 7 of the Introduction section set forth above are re-alleged and incorporated in this count by reference as if fully set forth herein.

15.     Beginning in and around December 2008, and continuing through April of 2012, the exact dates being unknown to the Grand Jury, in Miami Dade County, in the Southern District of Florida, and elsewhere, the defendant,

## BENNY PALMERI-BACCHI,

did knowingly obstruct, delay and affect interstate and foreign commerce and attempt to obstruct, delay and affect interstate and foreign commerce as the term "commerce" is defined in Title 18, United States Code, Section 1951(b)(3), by "extortion" as that term is defined in Title 18, United States Code, Section 1951(b)(2) in that the defendant did wrongfully use actual and threatened force, violence and fear against "J.C.S.," his family and friends, in order to obtain from "J.C.S."

5

money and property with his consent induced by said wrongful use of force, violence and fear.

In violation of Title 18, United States Code, Section 1951(a).

### FORFEITURE ALLEGATIONS

1.     The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which each of the defendants, **RODOLFO McTURK and BENNY PALMERI-BACCHI,** has an interest.

2.     Upon conviction of a violation of Title 21, United States Code, Section 963, as alleged in this Indictment, a defendant shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such violation, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation, pursuant to Title 21, United States Code, Sections 853(a)(1) and (2).

3.     Upon conviction of a violation of Title 18, United States Code, Section 1512 or Section 1951, as alleged in this Indictment, a defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation, pursuant to 18 U.S.C. § 981(a)(1)(C).

4.     Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in this Indictment, a defendant shall forfeit to the United States any property, real or personal, involved in such violation, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

6

5.  The property which is subject to forfeiture includes, but is not limited to a forfeiture money judgment in the sum of $2,500,000.00 in United States currency, which sum represents proceeds of the offenses;

6.  If any of the property described above, as a result of any act or omission of a defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).  Specifically, said substitute property may include the following:

    1)  the contents of Espirito Santo Bank Account Number 116456339;

    2)  the contents of Wells Fargo Account Number 20000-47616154;

    3)  the contents of Wells Fargo Account Number 1010121703233;

    4)  the contents of Wells Fargo Account Number 1010121703071;

    5)  the contents of Wells Fargo Account Number 1010121703107;

    6)  the contents of Wells Fargo Account Number 1010121703372;

7

7)      the contents of Banco Santander International Client Number 740175.

All pursuant to Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853.

A TRUE BILL

FOREPERSON

_C~N.C~, Chief, Criminal Div_

WIFREDO A. FERRER
UNITED STATES ATTORNEY

RICHARD D. GREGORIE
ASSISTANT UNITED STATES ATTORNEY

ADAM S. FELS
ASSISTANT UNITED STATES ATTORNEY

8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA                    CASE NO. _____

vs.
                                            **CERTIFICATE OF TRIAL ATTORNEY***
RODOLFO McTURK and
BENNY PALMERI-BACCHI,

_____ Defendants.    /            **Superseding Case Information:**

**Court Division:** (Select One)            New Defendant(s)        Yes _____   No ____
                                            Number of New Defendants ____
__X__ Miami  _____ Key West ____           Total number of counts   ____
_____ FTL    _____ WPB    ____ FTP

        I do hereby certify that:

1.      I have carefully considered the allegations of the indictment, the number of defendants, the number of
        probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.      I am aware that the information supplied in this statement will be relied upon by the Judges of this
        Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial
        Act, Title 28 U.S.C. Section 3161.
                                            Yes
3.      Interpreter:    (Yes or No)         Spanish
        List language and/or dialect _____

4.      This case will take ___10___ days for the parties to try.

5.      Please check appropriate category and type of offense listed below:

        (Check only one)                            (Check only one)

        I       0  to  5 days                       Petty      _____
        II      6  to 10 days        __X__          Minor      _____
        III     11 to 20 days        _____          Misdem.    _____
        IV      21 to 60 days        _____          Felony     __X__
        V       61 days and over     _____

6.      Has this case been previously filed in this District Court?  (Yes or No) _____
        If yes:
        Judge: _____          Case No. _____
        (Attach copy of dispositive order)
        Has a complaint been filed in this matter?   (Yes or No)   Yes
        If yes:
        Magistrate Case No.          12-mj-02410-PRP
        Related Miscellaneous numbers: _____
        Defendant(s) in federal custody as of _____
        Defendant(s) in state custody as of _____
        Rule 20 from the _____   District of _____

        Is this a potential death penalty case? (Yes or No)   No

7.      Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office
        prior to October 14, 2003?  _____  Yes  __X__  No

8.      Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office
        prior to September 1, 2007?  _____  Yes  __X__  No

                                            _____
                                            RICHARD D. GREGORIE
                                            ASSISTANT UNITED STATES ATTORNEY
                                            Florida Bar No. 549495

*Penalty Sheet(s) attached                                          REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:   RODOLFO McTURK**

**Case No:**

Count #: 1

Conspiracy to Distribute Cocaine with Knowledge of US Importation

Title 21, United States Code, Section 963

**\*Max. Penalty:** Life Imprisonment

Count #: 2

Conspiracy to Obstruct Justice

Title 18, United States Code, Section 1512(k)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

**Defendant's Name:   BENNY PALMERI-BACCHI**

**Case No:**

Count #: 1

Conspiracy to Distribute Cocaine with Knowledge of US Importation

Title 21, United States Code, Section 963

**\*Max. Penalty:** Life Imprisonment

Count #: 2

Conspiracy to Obstruct Justice

Title 18, United States Code, Section 1512(k)

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 3

Money Laundering Conspiracy

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 4

Interfere with Commerce by Extortion

Title 18, United States Code, Section 1951(a)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-20930-CR-UNGARO

UNITED STATES OF AMERICA,

vs.

BENNY PALMERI-BACCHI,

Defendant.

_____/

### FACTUAL PROFFER

If this case proceeded to trial, the United States would present witnesses and documentary evidence which would prove beyond a reasonable doubt the following:

On February 12, 2009, a Federal Grand Jury in Miami, The Southern District of Florida, returned an indictment charging Jaime Alberto Marin-Zamora, hereinafter referred to as Beto, with conspiring to distribute cocaine with the knowledge that such cocaine would be unlawfully imported into the United States in case number 09-20140-CR-PAS. The United States District Court then issued a warrant for the arrest of Beto dated February 12, 2009.

Beto was a ranking member of the North Valley drug Cartel headed by Wilbur Varela. Beto had moved from Colombia to Venezuela in 2006 to join Wilbur Varela who had moved his drug trafficking headquarters to Venezuela. Beto ran his drug trafficking operation from Venezuela under the protection of Venezuelan officials whom he bribed.

In early February of 2009, Beto was arrested by the Venezuelan head of Interpol, Rudolfo McTurk, who Beto bribed, in order to remain free in Venezuela to continue his drug trafficking operations. However, after Beto's bribe of McTurk, Beto recognized a need to obtain a legal basis

1

to remain free from arrest and extradition. Beto's attorney said that he had arranged for another client and could arrange for Beto, the filing of a false Venezuelan charge in the Venezuelan Court which would prevent Beto from being extradited while he was under investigation for charges in Venezuela.

In early 2009, the defendant, Benny Palmeri, hereinafter PALMERI, met with the attorney for Beto. PALMERI had been a prosecutor and Judge in the Venezuelan courts. PALMERI was made to understand that Beto was a large-scale cocaine trafficker whose base of operations was Venezuela, and that a warrant had been issued for Beto's arrest. PALMERI offered to facilitate the filing of local charges against Beto in Venezuela, which, PALMERI represented, would prevent Beto's capture in that country, in exchange for a payment of $1.5 million United States dollars. After PALMERI received an initial cash down payment on the fee, he did, in fact, arrange for a money laundering investigation to be brought against Beto in Venezuela. Beto appeared in court, but was not held in custody and the charges were not pursued.

Witness and documentary evidence shows that PALMERI received an international wire transfer of approximately $300,000 in United States currency from an intermediary provided by Beto's attorney. The funds were transferred from Venezuela to Curacao to Florida. Immediately after receiving the funds, PALMERI arranged for portions of the $300,000 to be transferred within a number of accounts (in a variety of names and shell companies) all controlled by PALMERI, as further described in the Motion Protective Order for Contents of various Wells Fargo Bank Account Numbers and accompanying Declaration of J. Brian Whitworth, Special Agent with the Drug Enforcement Administration, filed in this case at docket entry 19. PALMERI knew that the $300,000 were the proceeds of the distribution of cocaine, and arranged for the transactions knowing that the transactions were designed to conceal and disguise the nature, location, source,

2

Appendix B

ownership and control of the cocaine proceeds and were to further the agreement to prevent the extradition of Beto.

During the course of the conspiracies to launder the proceeds of illegal activity and prevent Beto's capture in Venezuela, PALMERI obtained the use of another individual's business and business bank account in Florida to further the criminal activity. This business and business bank account affected both foreign and interstate commerce. PALMERI obtained the use of the business and business bank account, in part, by threatening the owner of the business and business bank account with violence if the owner did not comply with PALMERI's demands.   For example, PALMERI sent an e-mail in August 2009 with subject header Assassinado (assassination).   The email contained a graphic video of the assassination of an individual by a brutal shooting of the individual sitting in a hair dressing salon. The video was accompanied by a short message from PALMERI to the business owner which translated into "this is what will happen to you if you don't behave."   Palmeri continued to use this victim to launder funds and assist in bribes through 2012. In 2012, PALMERI left several threatening messages on the business owner's voice mail – which were subsequently recovered from the victim business owner's telephone – warning the owner that he had to comply with PALMERI's requests.

3

Appendix  B

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: _11/05/14_                    By: _____
                                   Richard D. Gregorie
                                   Assistant U.S. Attorney

Date: _____             By: _____
                                   Adam Fels
                                   Assistant U.S. Attorney

Date: _11/05/14_                   By: _____
                                   Edward Joel Abramson, Esq.
                                   Attorney for Defendant

I hereby certify that this document was translated for me into my native language of Spanish and that the facts stated herein are correct to the best of my knowledge.

Date: _11-5-14_                    By: _____
                                   Benny Palmeri-Bacchi
                                   Defendant

4

Appendix B

Sealed

### DECLARATION OF J. BRIAN WHITWORTH
### IN SUPPORT OF APPLICATION FOR PROTECTIVE ORDER FOR
### WELLS FARGO BANK ACCOUNT NUMBERS:
### 1010121703233, 2000047616154, 1010121703071, 1010121703107, 1010121703372

I, J. Brian Whitworth, hereby swear and affirm as follows:

1.      I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since July 2012, and I have been assigned to the Miami Field Division (MFD) since January 2013.   In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including, but not limited to, violations of the controlled substances act, and money laundering.

2.      I am currently assigned to an enforcement group that focuses on international drug trafficking organizations.   I have received training on the subject of narcotics trafficking and money laundering from the DEA, including but not limited to the means and methods used by traffickers to import and distribute narcotics, interdiction, smuggling methods, and concealment of laundering of proceeds from illicit drug trafficking activities.   I have participated in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds.   In my capacity as a DEA Special Agent, I have participated in many drug investigations during the course of which I have conducted physical and electronic surveillances and trash pulls.   I have interviewed confidential sources of information and collaborated with Special Agents with the DEA and other agencies, who have years of experience in investigating the smuggling of controlled substances and money laundering schemes.

3.      Prior to my employment with DEA, I was a 12-year veteran of the Charlotte-Mecklenburg Police Department where I was a Detective with the International

1

Appendix  B

Case 0:12-cr-60088-WPD   Document 589   Entered on FLSD Docket 02/18/2020   Page 103 of
125
Case 0:12-cr-60088-WPD   Document 425   Entered on FLSD Docket 04/25/2016   Page 64 of 38
3-cr-20930-UU   Document 19-1   Entered on FLSD Docket 07/23/2014   Page 2 of 9

Relations Unit assigned to the Homeland Security Investigations (HSI) Task Force focusing mainly on money laundering, human smuggling/trafficking and aggravated identity theft.  I also spent four years in the Violent Crimes Bureau of the Charlotte-Mecklenburg Police Department, where for two years I investigated attempted murder and aggravated assault investigations.  For two years I was also a detective in the Homicide Unit where I investigated several murder, kidnapping, suicide, and death investigations.  I have conducted multiple interviews of suspects and have analyzed information obtained from court ordered pen register/trap and trace intercepts, International Protocol (IP) addresses, analyzed telephone toll information obtained as a result of subpoenas issued by the Charlotte-Mecklenburg Police Department and, HSI, as well as reviewed numerous taped conversations and records of drug traffickers, homicide suspects and members of organized street gangs.

4.     The information in this Declaration is based on my personal knowledge as well as information provided to me by other law enforcement agents and non-law enforcement agencies. This Declaration does not include all of the facts known to me relating to this investigation, but instead sets forth only those facts that I believe are necessary to establish probable cause for the issuance of a protective order for the bank accounts listed below in paragraph 8.

5.     On December 19, 2013, an Indictment (the "Indictment") was filed under seal in *United States v. Rodolfo McTurk and Benny Palmeri-Bacchi*, Case No. 13-20930-CR-UNGARO. The General Allegations and Counts 1-4 of the Indictment are realleged and expressly incorporated herein as if set forth in full.  The Indictment remains under seal and a copy is attached as Exhibit 1.

6.     As alleged in the Indictment, upon conviction of the charged drug conspiracy (Count 1), the United States of America (the "United States") is authorized to seek forfeiture of

2

Appendix  B

any property of each named defendant which constitutes or is derived from, proceeds obtained, directly or indirectly, as the result of such offense, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense, pursuant to Title 21, United States Code, Sections 853(a)(1) and (2). Upon conviction of the charged obstruction of justice conspiracy (Count 2) or the extortion violation (Count 4), the United States is authorized to seek forfeiture of any property of each named defendant, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 981(a)(1)(C). Lastly, upon conviction of the charged money laundering conspiracy (Count 3), the United States is authorized to seek forfeiture of any property of each named defendant, real or personal, involved in such violation, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1). The specified unlawful activity alleged in the money laundering is conspiracy to distribute cocaine, a Schedule II controlled substance, knowing that such substance will be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a)(2) and 963, and conspiracy to obstruct justice in violation of Title 18, United States Code, Section 1512(k).

7.     The forfeiture allegations in the Indictment indicate that the property subject to forfeiture includes a forfeiture money judgment in the sum of $2,500,000 in United States currency, which sum represents proceeds of the charged offenses.

8.     The property to be restrained is the contents, including interest, in the following accounts at Wells Fargo Bank:

   a.     **Account Number 1010121703233,
          in the name of Benny Palmeri, Simone and Angel C. Palmeri;**

   b.     **Account Number 2000047616154,
          in the name of BTMS LLC;**

Appendix B

c.   Account Number 1010121703071,
     in the name of Benny Palmeri, Simone and Angel C. Palmeri;

d.   Account Number 1010121703107,
     in the name of Angel C. Palmeri or Simone Palmeri, Karina
     Montelongo; and

e.   Account Number 1010121703372,
     in the name of Simone Palmeri, Angel Palmeri, Benny
     Palmeri, Antonia Bacchi.

9.   Based on my training and experience and the facts as set forth in the underlying Indictment and this Declaration, there is probable cause to believe that violations of 21 U.S.C. § 963 (drug conspiracy), 18 U.S.C. § 1512(k) (obstruction of justice conspiracy), 18 U.S.C. § 1951(a) (extortion), and 18 U.S.C. § 1956(h) (money laundering conspiracy) and related crimes have been committed by BENNY PALMERI-BACCHI, also known as Benny Palmeri, ("PALMERI-BACCHI") as further discussed below.

10.   On February 12, 2009, a Federal Grand Jury in the Southern District of Florida did indict Jaime Alberto Marin-Zamora ("Marin-Zamora"), also known as "Beto" or "Beto Marin," for conspiring to distribute cocaine with the knowledge that such cocaine would be unlawfully imported into the United States. *See* Case No. 09-20140-CR-PAS, DE 1, Indictment, attached as Exhibit 2.   On the same day, the United States District Court for the Southern District of Florida issued an arrest warrant for the arrest of Marin-Zamora on the indictment.

11.   Marin-Zamora remained a fugitive until his initial appearance in the Southern District of Florida on September 21, 2010 (Case No. 09-20140-CR-PAS, DE 3, 4). Marin-Zamora pled guilty to the charged drug conspiracy and was sentenced to a serve a term of imprisonment of 195 months (Case No. 09-20140-CR-PAS, DE 3, 4). The district court also entered an Order and Judgment of Forfeiture against Marin-Zamora in the amount of $1,000,000 in United States

4

Appendix  B

currency, the sum equal in value to the property constituting or derived from the proceeds that Marin-Zamora obtained, directly or indirectly, as the result of the charged drug conspiracy (Case No. 09-20140-CR-PAS, DE 38).

12.     In and around February 2009, Marin-Zamora was arrested in Venezuela by RODOLFO McTURK ("McTURK"), who was a Venezuelan officer in the Venezuelan Police Agency known as the C.I.C.P.C., Cuerpo de Investigaciones Científicas, Penales y Criminalísticas and was the Director of the International Police Office, Interpol, for Venezuela.   The arrest was done in an effort to delay and prevent Marin-Zamora's extradition to the United States on the pending criminal charge, in exchange for approximately $1 million dollars in United States currency.   Marin-Zamora disclosed to agents of the United States that he authorized cooperating co-conspirator # 1 (CC#1) to assist with these matters and the $1 million payment requested by McTURK.

13.     CC#1 contacted PALMERI-BACCHI, to create false drug or money laundering charges against Marin-Zamora in Venezuela.   PALMERI-BACCHI was a Venezuelan attorney who served as a judge, prosecutor and attorney in the Venezuelan judicial system.

14.     Marin-Zamora directed to PALMERI-BACCHI approximately $850,000 in United States currency for the creation of the drug trafficking charges in Venezuela.  In March or April 2009, Marin-Zamora began directing cash payments toward the total amount of the bribe PALMERI-BACCHI requested that part of the bribe, $300,000 in United States currency, be transferred into one of his bank accounts in the United States.

15.     CC#1 requested the assistance of David Jacobo Taurel Shamis ("Taurel Shamis") to receive the transfer of $300,000 in United States currency in Taurel Shamis' bank account in the United States, and then transfer the funds to an account of PALMERI-BACCHI.   Taurel Shamis

Appendix  B

Case 0:12-cr-60088-WPD   Document 589   Entered on FLSD Docket 02/18/2020   Page 107 of
125
Case 0:12-cr-60088-WPD   Document 435   Entered on FLSD Docket 04/25/2016   Page 94 of 38
3-cr-20930-UU   Document 19-1   Entered on FLSD Docket 07/23/2014   Page 6 of 9

agreed to receive the money and make the transfer to PALMERI-BACCHI. In May and June 2009, Marin-Zamora and CC#1 arranged for two international transfers of funds from Curacao into Banco Santander International ("BSI") Account Number 740175, an account controlled by Taurel Shamis, for a total of approximately $599,950 in United States currency. Based on information provided by Marin-Zamora and other cooperators, all of these funds are believed to be proceeds from the drug conspiracy and the obstruction of justice conspiracy charged in the Indictment. Further investigation revealed BSI Account Number 740175 has been closed.

16.   On September 8, 2009, $100,000 was transferred from BSI Account Number 740175 into Espirito Santo Bank ("ESB") Account Number 116456339, another account controlled by Taurel Shamis. Based on information provided by Marin-Zamora and other cooperators, all of these funds deposited and transferred to ESB Account Number 116456339 are believed to be proceeds from the drug conspiracy and the obstruction of justice conspiracy charged in the Indictment.

17.   On September 8, 2009, $300,000 was transferred from BSI Account Number 740175 into a United States Wells Fargo Bank ("Wells Fargo," formerly Wachovia Bank) Account Number 1010121703233 in the name of Benny Palmeri, and his relatives, Simone and Angel C. Palmeri, controlled by PALMERI-BACCHI. Based on information provided by Marin-Zamora and other cooperators, these funds deposited and transferred to Wells Fargo Account Number 1010121703233 are believed to be proceeds from the drug conspiracy and the obstruction of justice conspiracy charged in the Indictment.

18.   On September 9, 2009, $300,000 was transferred from Wells Fargo Account Number 1010121703233 to another United States Wells Fargo Account Number 2000047616154 in the name of BTMS LLC, an account controlled by PALMERI-BACCHI. BTMS LLC was

Appendix  B

registered with the State of Florida as a Florida limited liability Company effective April 7, 2009, and Benny Palmeri was listed as the Managing Manager of the company. Based on information provided by Marin-Zamora and other cooperators, all of these funds deposited and transferred to Wells Fargo Account Number 2000047616154 are believed to be proceeds from the drug conspiracy and the obstruction of justice conspiracy charged in the Indictment. Thereafter, multiple transfers of funds were made between the five Wells Fargo accounts referenced in paragraph 8, all of which are controlled by PALMERI-BACCHI.

19. Further investigation revealed that PALMERI-BACCHI had contacted a cooperating co-conspirator #2 ("CC#2") to assist in opening multiple bank accounts and corporations so PALMERI-BACCHI could transfer money from Venezuela and Europe to the United States. CC#2 took PALMERI-BACCHI to Bank of America and Wells Fargo Bank (formerly Wachovia), where they opened several bank accounts in various names. PALMERI-BACCHI deposited money in all of the bank accounts and instructed CC#2 to have the bank statements e-mailed to PALMERI-BACCHI.

20. Between 2009 and 2010, PALMERI-BACCHI extorted CC#2 by forcing him to make purchases for PALMERI-BACCHI to include, but not limited to, vehicles and computers, and having them shipped to Margarita Island, Venezuela. CC#2 linked CC#2's business account to PALMERI-BACCHI's accounts at Wells Fargo in order to facilitate the transfer of monies from PALMERI-BACCHI's accounts into an account of CC#2 to help make purchases. CC#2 continued to assist PALMERI-BACCHI while under an assumed threat against CC#2 and CC#2's family in Venezuela.

21. In the summer of 2010, PALMERI-BACCHI told CC#2 to travel to Venezuela. While in Venezuela, CC#2 signed over vehicle titles to PALMERI-BACCHI and/or his associates

7

Appendix B

which had been shipped to Venezuela.  One of the vehicles was given to Antonio Denis de Jesus ("Denis de Jesus"), a counter narcotics judge.  PALMERI-BACCHI informed CC#2 that he was trying to create false drug trafficking charges for a Colombian, later identified as Marin-Zamora, in order to prevent his extradition from Venezuela.  PALMERI-BACCHI stated that all the money he was moving into the United States was received from Marin-Zamora. PALMERI-BACCHI further explained that some of the vehicles purchased were payments to Denis de Jesus for the creation of the false drug trafficking charges.

    22.    Accordingly, based on the information in this Affidavit, I respectfully submit that there is probable cause to believe that each of the Wells Fargo Bank Accounts referenced in paragraph 8 above: a) is property that was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the drug conspiracy charged in Count 1 of the Indictment, in violation of 21 U.S.C. § 963, and is subject to forfeiture pursuant to 21 U.S.C. § 853(a)(2); and b) is property involved in the money laundering conspiracy charged in Count 4 of the Indictment, or any property traceable to such property, in violation of 18 U.S.C. § 1956(h), and is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1).

Appendix  B

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury that the facts alleged herein are true and correct to the best of my knowledge.

Executed this 18th day of July, 2014.

_____
J. BRIAN WHITWORTH
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

9

Appendix  B

## APPENDIX C

<u>CONTENT:</u>

* ADMISTRATIVE DETENTION ORDER (placing petitioner under protective custody)

* Form I-918 Instructions for Supplement B

* Form I-918 Supplement B, U Nonimmigrant Status Certification

BP-A0308
AUG 11

**ADMINISTRATIVE DETENTION ORDER**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

DRJCF

Institution

Date/Time:  1/12/2020/2135HRS

TO: Special Housing Unit Officer

FROM:  C. HOWARD/CAPTAIN _____ , (Name/Title)

SUBJECT : Placement of  SANCHEZ, JUAN _____ , Reg. No.  66858-054 _____ , in Administrative Detention

_____ (a)   Is pending a hearing for a violation of Bureau regulations;

_____ (b)   Is pending investigation of a violation of Bureau regulations;

_____ (c)   Is pending investigation or trial for a criminal act;

__✓__ (d)   Is to be admitted to Administrative Detention

____✓____ (1)   Since the inmate has requested admission for protection;

I hereby request placement in Administrative Detention for my own protection.

Inmate Signature/Register No.: _____ 66858-054

Staff Witness Printed Name Signature:  Goettie _____

_____ (2)   Since a serious threat exists to individual's safety as perceived by staff, although person has not requested admission; referral of the necessary information will be forwarded to the UDC/DHO for appropriate hearing.

_____ (e)   Is pending transfer or is in holdover status during transfer.

_____ (f)   Is pending classification; or

_____ (g)   Is terminating confinement in Disciplinary Segregation and has been ordered into Administrative Detention by the Warden's designee.

It is this Correctional Supervisor's decision based on all the circumstances that the above named inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or to the security or orderly running of the institution because*
INMATE WAS PLACED IN RHU FOR PROTECTIVE CUSTODY

Therefore, the above named inmate is to be placed in Administrative Detention until further notice. The inmate received a copy of this Order on

(date / time)  1/12/20         2135 Hrs

Staff Witness Signature/Printed Name _____ Goettie _____ Date  1/12/20

* In the case of DHO action, reference to that order is sufficient. In other cases, the Correctional supervisor will make an independent review and decision, which is documented here.

Record Copy - Inmate Concerned (not necessary if placement is a result of holdover status); Copy - Captain; Copy - Unit Manager; Copy - Operation Supervisor - Administrative Detention Unit; Copy - Central File

PDF                                Prescribed by P5270                (Replaces BP-308(52) of JAN 1988.)



**Instructions for Supplement B,
U Nonimmigrant Status Certification**

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-918**
OMB No. 1615-0104
Expires 04/30/2021

## What Is the Purpose of Supplement B?

You should use this supplement to certify that an individual submitting Form I-918, Petition for U Nonimmigrant Status, is a victim of certain qualifying criminal activity and was, is, or is likely to be helpful in the investigation or prosecution of that activity.

## Who May File Supplement B?

If you, the certifying official, determine that this individual (also known as the petitioner and principal) was, is, or is likely to be helpful in the investigation or prosecution of the qualifying criminal activity, you may complete Supplement B, U Nonimmigrant Status Certification. The petitioner must submit Supplement B to U.S. Citizenship and Immigration Services (USCIS) with his or her Form I-918.

"Investigation or prosecution" refers to the detection or investigation of a qualifying crime or criminal activity, as well as to the prosecution, conviction, or sentencing of the perpetrator of the qualifying crime or criminal activity.

**NOTE:** The decision whether to complete Supplement B is at the discretion of the certifying agency. However, without a completed Supplement B, the petitioner will be ineligible for U nonimmigrant status.

To be eligible for U nonimmigrant status, the petitioner must be a victim of qualifying criminal activity. The term "victim" generally means an individual who has suffered direct and proximate harm as a result of the commission of qualifying criminal activity.

USCIS will consider the petitioner's spouse and unmarried children under 21 years of age, and the parents and unmarried siblings under 18 years of age if the victim is under 21 years of age, as victims of qualifying criminal activity where:

1. The direct victim is deceased due to murder or manslaughter; or

2. The direct victim is incompetent or incapacitated and, therefore, unable to provide information concerning the criminal activity or unable to be helpful in the investigation or prosecution of the criminal activity.

USCIS will consider a petitioner a victim of witness tampering, obstruction of justice, or perjury, including any attempt, conspiracy, or solicitation to commit one or more of those offenses if:

1. The victim was directly and proximately harmed by the perpetrator of the witness tampering, obstruction of justice, or perjury; and

2. There are reasonable grounds to conclude that the perpetrator committed the witness tampering, obstruction of justice, or perjury offense, at least in principal part, as a means:

   A. To avoid or frustrate efforts to investigate, arrest, prosecute, or otherwise bring to justice the perpetrator for other criminal activity; or

   B. To further the perpetrator's abuse or exploitation of or undue control over the petitioner through manipulation of the legal system.

**NOTE:** A person who is culpable for the qualifying criminal activity being investigated or prosecuted is excluded from being recognized as a victim.

A victim of qualifying criminal activity must provide evidence that he or she has been, is being, or is likely to be helpful to a certifying official in the investigation or prosecution of the qualifying criminal activity as listed in **Part 3.** of this supplement. In the case of a petitioner under 16 years of age or a petitioner who is incapacitated or incompetent, the parent, guardian, or "next friend" of the petitioner may provide evidence on behalf of the petitioner to be helpful to a certifying official's investigation. "Next friend" is a person who appears in a lawsuit to act for the benefit of a victim under 16 years of age or incapacitated or incompetent, who has suffered substantial physical or mental abuse as a result of being a victim of qualifying criminal activity. The next friend is not a party to the legal proceeding and is not appointed as a guardian. Being "helpful" means assisting law enforcement authorities in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim.

**NOTE:** Once you, the certifying official, have completed Supplement B, it will be valid for six months from the date of signature. If the victim does not file Form I-918, Petition for U Nonimmigrant Status, within six months, the victim will need to obtain a new Supplement B from the certifying agency.

## General Instructions

**How to Fill Out Supplement B**

1. Type or print legibly in black or blue ink.

2. If you need extra space to complete any item within this supplement, use the space provided in **Part 7. Additional Information** or attach a separate sheet of paper; type or print the agency's name, petitioner's name, and the Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number, Part Number, and Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you type or print "N/A," unless otherwise directed. If your answer to a question which requires a numeric response is zero or none, type or print "None."

4. Each Supplement B must be properly signed and filed. USCIS will not accept a photocopy of the signature page of the Supplement B or a typewritten name in place of a signature.

## Specific Instructions

This supplement is divided into **Parts 1. - 7.** The following information should help you fill out the supplement.

**Part 1. Victim Information**

**Item Number 1. Alien Registration Number (A-Number)** (if any). This is the victim's USCIS file number. If the victim does not have an A-Number or you do not know it, leave this space blank.

**Item Numbers 2.a. - 2.c. Full Name.** Provide the victim's full legal name. Do not provide a nickname.

**Item Numbers 3.a. - 3.c. Other Names Used.** Provide other names used by the victim, including his or her maiden name, nicknames, and aliases, if applicable.

**Item Number 4. Date of Birth** (mm/dd/yyyy). Provide his or her date of birth (Example, May 1, 1979, should be written 05/01/1979).

**Item Number 5. Gender.** Select the appropriate box.

## Part 2. Agency Information

**Item Number 1.  Name of Certifying Agency.**  The certifying agency must be a Federal, state, local, or tribal law enforcement agency; prosecutor; authority; or Federal, state, or local judge that has responsibility for the detection, investigation, prosecution, conviction, or sentencing of the qualifying criminal activity of which the petitioner was a victim.

This includes traditional law enforcement branches with the criminal justice system and other agencies that have criminal investigative jurisdiction in their respective areas of expertise, including, but not limited to, Child Protective Services, the Equal Employment Opportunity Commission, and the Department of Labor.

**Item Number 2.a. - 2.c.  Name of Certifying Official.**

A certifying official is:

1.  The head of the certifying agency or any person in a supervisory role, who was specifically designated by the head of the certifying agency to issue a U Nonimmigrant Status Certification on behalf of that agency; or

2.  A Federal, state, or local judge.

If the certification is not signed by the head of the certifying agency, attach evidence of the agency head's written designation of the certifying official for this specific purpose.

**Item Numbers 3. - 10.**  Provide the requested information regarding agency officials, the agency's address, agency type, case status, certifying agency category, case number, and FBI Number or SID Number.

## Part 3. Criminal Acts

**Item Numbers 1. – 3.**  Select all of the crimes of which the petitioner is a victim that your agency is investigating, prosecuting, or sentencing and provide the dates of the criminal activity.  If the criminal activity occurred over a period of time, provide a date on which at least one act constituting an element of qualifying criminal activity occurred.  If multiple incidents occurred, provide the date of each incident investigated or prosecuted.  List the statutory citations for the crimes in the space provided.  If the crimes of which the petitioner is a victim are not listed, select the crimes that are similar to those crimes.  You may provide a written explanation regarding how the crime of which the petitioner is a victim is similar to the listed crimes.  Similar activity refers to criminal offenses in which the nature and elements of the offenses are substantially similar to the list of criminal activity at section 101(a)(15)(U)(iii) of the Immigration and Nationality Act (INA) and found on the certification form itself.

**Item Numbers 4.a. - 7.**  Indicate whether the qualifying criminal activity violated the laws of the United States or occurred within the United States (including in Indian country and military installations) or the territories and possessions of the United States.  Qualifying criminal activity of which the petitioner is a victim had to violate United States law or occur within the United States.

1.  **United States** means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Commonwealth of Northern Mariana Islands (CNMI), and the U.S. Virgin Islands.

2.  **Indian country** refers to all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation; all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through such allotments.

3.  **Military installation** means any facility, base, camp, post, encampment, station, yard, center, port, aircraft, vehicle, or vessel under the jurisdiction of the Department of Defense, including any leased facility, or any other location under military control.

4.   **Territories and possessions of the United States** means American Samoa, Swains Island, Bajo Nuevo (the Petrel Islands), Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Atoll, Navassa Island, Palmyra Atoll, Serranilla Bank, and Wake Atoll.

If the qualifying criminal activity did not occur within the United States as discussed above, but was in violation of U.S. law, it must violate a Federal extraterritorial jurisdiction statute. There is no requirement that a prosecution actually occur. Provide the statutory citation for the extraterritorial jurisdiction.

## Part 4. Helpfulness of the Victim

**Item Number 1.** Indicate whether the victim possesses information about the crimes. A petitioner must possess information about the qualifying criminal activity of which he or she is a victim. A petitioner is considered to possess information concerning qualifying criminal activity of which he or she is a victim if he or she has knowledge of details concerning criminal activity that would assist in the investigation or prosecution of the criminal activity. Victims with information about a crime of which they are not a victim will not be considered to possess information concerning qualifying criminal activities.

When the victim is under 16 years of age, incapacitated, or incompetent, he or she is not required to personally possess information regarding the qualifying criminal activity. The parent, guardian, or next friend of the petitioner may provide that information.

**Item Number 2.** Provide an explanation of the victim's helpfulness to the investigation or prosecution of the criminal activity. A victim must provide evidence to USCIS that he or she was, is, or is likely to be helpful to a certifying official in the investigation or prosecution of the qualifying criminal activity. In the case of a victim under 16 years of age or a victim who is incapacitated or incompetent, the parent, guardian, or next friend of the victim may provide evidence on behalf of the victim to be helpful to a certifying official's investigation.

Being "helpful" means assisting law enforcement authorities in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim. Petitioner victims who, after initiating cooperation, refuse to provide continuing assistance when reasonably requested, will not meet the helpfulness requirement. The victim has an ongoing responsibility to be helpful, assuming there is an ongoing need for the victim's assistance.

You, the certifying official, will make the initial determination as to the helpfulness of the petitioner. USCIS will give a properly executed Supplement B significant weight, but USCIS will not consider it conclusory evidence that the victim has met the eligibility requirements. USCIS will look at the totality of the circumstances surrounding the petitioner's involvement with your agency and all other information known to USCIS in determining whether the petitioner meets the elements of eligibility.

**Item Number 3.** Indicate if the victim has refused or failed to provide assistance reasonably requested since the initiation of cooperation. Explain in the space provided. If you need extra space, use the space provided in **Part 7. Additional Information**; type or print the agency's name, petitioner's name, and the A-Number (if any) at the top of each sheet; indicate the **Page Number, Part Number,** and **Item Number** to which your answer refers; and sign and date each sheet.

**Item Number 4.** Include any additional information you would like to provide.

## Part 5. Family Members Culpable In Criminal Activity

**Item Numbers 1. - 4.e.** List whether any of the victim's family members are culpable or are believed to be culpable in the criminal activity of which the petitioner is a victim, their relationship to the victim, and their culpability in the criminal activity. USCIS will not grant U nonimmigrant status to a qualifying family member who committed the qualifying criminal activities that established the victim's eligibility for U nonimmigrant status, in a family violence or trafficking context.

## Part 6. Certification

**Item Numbers 1. - 4.** Read the certification block carefully, and sign and date the supplement. Provide your daytime telephone number and a fax number (if any).

**NOTE:** At your discretion, you may withdraw or disavow a Form I-918, Supplement B at any time, even after this supplement is submitted to USCIS, if a victim unreasonably refuses to assist in the investigation or prosecution of the qualifying criminal activity. To do so, you must notify USCIS by sending a written statement to:

> **USCIS - Vermont Service Center**
> **75 Lower Welden Street**
> **St. Albans, VT 05479-0001**

Include the victim's name, date of birth, and A-Number (if any) on all correspondence.

## Part 7. Additional Information

**Item Numbers 1. - 6.d.** If you need extra space to provide any additional information within this supplement, use the space provided in **Part 7. Additional Information**. If you need more space than what is provided in **Part 7.**, you may make copies of **Part 7.** to complete and file with your supplement, or attach a separate sheet of paper. Include your agency's name, the petitioner's name, and A-Number (if any) at the top of each sheet; indicate the **Page Number, Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

---

### DHS Privacy Notice

**AUTHORITIES:** The information requested on this supplement, and the associated evidence, is collected under the Immigration and Nationality Act, sections 101(a)(15)(U) and Public Law 106-386, section 1513(c).

**PURPOSE:** The primary purpose for providing the requested information on this supplement is to certify that an individual submitting a Form I-918, Petition for U Nonimmigrant Status, is a victim of certain qualifying criminal activity and has been, is being, or is likely to be helpful in the investigation or prosecution of that activity. The Department of Homeland Security (DHS) uses the information you provide to grant or deny the immigration benefit the petitioner is seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of the Form I-918 petition.

**ROUTINE USES:** DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this supplement and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System, DHS/USCIS-007 - Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check] and the published privacy impact assessment [DHS/USCIS/PIA-016a Computer Linked Application Information Management system and Associated Systems] which you can find at **www.dhs.gov/privacy**. DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

---

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a current valid OMB control number.  The public reporting burden for Supplement B is estimated at 1 hour per response, including the time for reviewing instructions, gathering the required documentation and information, completing the supplement, attaching necessary documentation, and submitting the supplement.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Ave NW, Washington, DC 20529-2140; OMB No. 1615-0104.  **Do not mail your completed Supplement B to this address.**



# Supplement B, U Nonimmigrant Status Certification

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-918**
OMB No. 1615-0104
Expires 04/30/2021

| For USCIS Use Only | Remarks |
|---|---|
| | |

▶ **START HERE - Type or print in black or blue ink.**

## Part 1. Victim Information

1. Alien Registration Number (A-Number) (if any)
   ▶ A- 0 7 3 7 8 7 1 2 6

2.a. Family Name (Last Name)    SANCHEZ

2.b. Given Name (First Name)    JUAN

2.c. Middle Name    CARLOS

**Other Names Used** (Include maiden names, nicknames, and aliases, if applicable.)

If you need extra space to provide additional names, use the space provided in **Part 7. Additional Information**.

3.a. Family Name (Last Name)    N/A

3.b. Given Name (First Name)

3.c. Middle Name

4. Date of Birth (mm/dd/yyyy)    05/23/1973

5. Gender    [x] Male    [ ] Female

## Part 2. Agency Information

1. Name of Certifying Agency

Name of Certifying Official

2.a. Family Name (Last Name)

2.b. Given Name (First Name)

2.c. Middle Name

3. Title and Division/Office of Certifying Official

Name of Head of Certifying Agency

4.a. Family Name (Last Name)

4.b. Given Name (First Name)

4.c. Middle Name

## Agency Address

5.a. Street Number and Name

5.b. [ ] Apt.  [ ] Ste.  [ ] Flr.

5.c. City or Town

5.d. State    5.f. ZIP Code

5.g. Province

5.h. Postal Code

5.i. Country

## Other Agency Information

6. Agency Type
   [ ] Federal    [ ] State    [ ] Local

7. Case Status
   [ ] On-going    [ ] Completed
   [ ] Other

8. Certifying Agency Category
   [ ] Judge    [ ] Law Enforcement    [ ] Prosecutor
   [ ] Other

9. Case Number

10. FBI Number or SID Number (if applicable)

## Part 3. Criminal Acts

If you need extra space to complete this section, use the space provided in **Part 7. Additional Information.**

1. The petitioner is a victim of criminal activity involving a violation of one of the following Federal, state, or local criminal offenses (or any similar activity). (Select **all applicable** boxes)

- [ ] Abduction
- [ ] Abusive Sexual Contact
- [ ] Attempt to Commit Any of the Named Crimes
- [ ] Being Held Hostage
- [ ] Blackmail
- [ ] Conspiracy to Commit Any of the Named Crimes
- [ ] Domestic Violence
- [ ] Extortion
- [ ] False Imprisonment
- [ ] Felonious Assault
- [ ] Female Genital Mutilation
- [ ] Fraud in Foreign Labor Contracting
- [ ] Incest
- [ ] Involuntary Servitude
- [ ] Kidnapping

- [ ] Manslaughter
- [ ] Murder
- [ ] Obstruction of Justice
- [ ] Peonage
- [ ] Perjury
- [ ] Prostitution
- [ ] Rape
- [ ] Sexual Assault
- [ ] Sexual Exploitation
- [ ] Slave Trade
- [ ] Solicitation to Commit Any of the Named Crimes
- [ ] Stalking
- [ ] Torture
- [ ] Trafficking
- [ ] Unlawful Criminal Restraint
- [ ] Witness Tampering

Provide the dates on which the criminal activity occurred.

**2.a.** Date (mm/dd/yyyy) _____

**2.b.** Date (mm/dd/yyyy) _____

**2.c.** Date (mm/dd/yyyy) _____

**2.d.** Date (mm/dd/yyyy) _____

3. List the statutory citations for the criminal activity being investigated or prosecuted, or that was investigated or prosecuted.

_____

_____

**4.a.** Did the criminal activity occur in the United States (including Indian country and military installations) or the territories or possessions of the United States?

- [ ] Yes  [ ] No

**4.b.** If you answered "Yes," where did the criminal activity occur?

_____

_____

**5.a.** Did the criminal activity violate a Federal extraterritorial jurisdiction statute?  [ ] Yes  [ ] No

**5.b.** If you answered "Yes," provide the statutory citation providing the authority for extraterritorial jurisdiction.

_____

_____

6. Briefly describe the criminal activity being investigated and/or prosecuted and the involvement of the petitioner named in **Part 1.** Attach copies of all relevant reports and findings.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

7. Provide a description of any known or documented injury to the victim. Attach copies of all relevant reports and findings.

_____

_____

_____

_____

_____

_____

_____

## Part 4. Helpfulness Of The Victim

For the following questions, if the victim is under 16 years of age, incompetent or incapacitated, then a parent, guardian, or next friend may act on behalf of the victim.

1.  Does the victim possess information concerning the criminal activity listed in **Part 3.**?   ☐ Yes   ☐ No

2.  Has the victim been helpful, is the victim being helpful, or is the victim likely to be helpful in the investigation or prosecution of the criminal activity detailed above?   ☐ Yes   ☐ No

3.  Since the initiation of cooperation, has the victim refused or failed to provide assistance reasonably requested in the investigation or prosecution of the criminal activity detailed above?   ☐ Yes   ☐ No

If you answer "Yes" to **Item Numbers 1. - 3.**, provide an explanation in the space below.  If you need extra space to complete this section, use the space provided in **Part 7. Additional Information.**

4.  Other.  Include any additional information you would like to provide.

## Part 5.  Family Members Culpable In Criminal Activity

1. Are any of the victim's family members culpable or believed to be culpable in the criminal activity of which the petitioner is a victim?   ☐ Yes   ☐ No

If you answered "Yes," list the family members and their criminal involvement.  (If you need extra space to complete this section, use the space provided in **Part 7. Additional Information.**)

**2.a.** Family Name (Last Name)

**2.b.** Given Name (First Name)

**2.c.** Middle Name

**2.d.** Relationship

**2.e.** Involvement

**3.a.** Family Name (Last Name)

**3.b.** Given Name (First Name)

**3.c.** Middle Name

**3.d.** Relationship

**3.e.** Involvement

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

**4.d.** Relationship

**4.e.** Involvement

## Part 6.  Certification

I am the head of the agency listed in **Part 2.** or I am the person in the agency who was specifically designated by the head of the agency to issue a U Nonimmigrant Status Certification on behalf of the agency.  Based upon investigation of the facts, I certify, under penalty of perjury, that the individual identified in **Part 1.** is or was a victim of one or more of the crimes listed in **Part 3.**  I certify that the above information is complete, true, and correct to the best of my knowledge, and that I have made and will make no promises regarding the above victim's ability to obtain a visa from U.S. Citizenship and Immigration Services (USCIS), based upon this certification.  I further certify that if the victim unreasonably refuses to assist in the investigation or prosecution of the qualifying criminal activity of which he or she is a victim, I will notify USCIS.

1. Signature of Certifying Official (sign in ink)

➡

2. Date of Signature (mm/dd/yyyy)

3. Daytime Telephone Number

4. Fax Number

## Part 7.  Additional Information

If you need extra space to complete any item within this supplement, use the space below or attach a separate sheet of paper; type or print the agency's name, petitioner's name, and the Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number, Part Number,** and **Item Number** to which your answer refers; and sign and date each sheet.  If you need more space than what is provided, you may also make copies of this page to complete and file with this supplement.

1.  Agency Name

### Petitioner's Name

2.a.  Family Name
(Last Name)

2.b.  Given Name
(First Name)

2.c.  Middle Name

3.  A-Number (if any)

▶ A-

4.a.  Page Number

4.b.  Part Number

4.c.  Item Number

4.d.

5.a.  Page Number

5.b.  Part Number

5.c.  Item Number

5.d.

6.a.  Page Number

6.b.  Part Number

6.c.  Item Number

6.d.





9114 9023



FEB 1 2 2020